# EXHIBIT 1

**FILED**
**10/26/2018 1:59 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ABBVIE INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No.: **18CH00001213** |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MARK STENHOUSE, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff AbbVie Inc. ("AbbVie") brings this Verified Complaint for Injunctive and Other

Relief against Defendant Mark Stenhouse and alleges as follows:

## INTRODUCTION

1.      AbbVie seeks preliminary and permanent injunctive relief to prevent irreparable

harm to its business by Mark Stenhouse, AbbVie's former employee and Vice President.

Stenhouse has an express contractual obligation not to solicit certain employees at AbbVie, the

company where he worked for nearly three decades.  Nevertheless, Stenhouse has engaged in a

repeated and prolonged campaign to recruit AbbVie employees to work for his new employer,

Exact Sciences Corporation ("Exact Sciences").  Stenhouse has already recruited four senior

employees, and a recently-discovered document proves that he violated his contractual obligations

in doing so.  The document, authored by one of those employees and stored in AbbVie's email

system, demonstrates that even while still an AbbVie employee, Stenhouse repeatedly solicited

employees and willfully recruited a "select group" of AbbVie employees.  The brazenness of his

recruiting tactics, and the fact that a senior AbbVie employee who worked under Stenhouse just left to join him at Exact Sciences weeks ago, show that Stenhouse will not abide by his contractual obligations unless forced to do so.

2.      AbbVie develops, manufactures, and sells innovative pharmaceutical products, including the top-selling medication in the world. AbbVie's products are used to treat a wide range of serious and life-threatening illnesses affecting all body systems. AbbVie employs very skilled and experienced people in many fields, from research and development to sales and marketing.

3.      Since 1990, Stenhouse had worked in sales and marketing for AbbVie and its predecessor, Abbott, and since 2005, he had worked with AbbVie's most successful gastroenterology medicine.

4.      On March 31, 2018, Stenhouse left his position as Vice President at AbbVie to become President of Exact Sciences' Cologuard division. Exact Sciences is a biotechnology company that markets one FDA-approved product, a non-invasive at-home screening test for colon cancer, and has other products in development. Stenhouse's new role is to guide Cologuard's marketing, sales, and medical affairs. Cologuard is marketed to gastroenterologists – the same type of doctors Stenhouse focused on at AbbVie. Although Cologuard has been on the market since 2014, Exact Sciences announced it is expanding its Cologuard marketing campaign starting in the fourth quarter of 2018, in conjunction with a recently-announced partnership with Pfizer Inc.

5.      Stenhouse's employee agreement ("Agreement") with AbbVie precludes him, both during his employment and for a period of two years following employment at AbbVie, from soliciting those AbbVie employees about whom he acquired knowledge through his work at AbbVie to work for any other company. In his various roles at AbbVie, Stenhouse gained insight

into the talents and skills of many AbbVie employees, particularly in the areas of gastroenterology, product launch, and new marketing campaigns (all key areas relevant to Cologuard and Exact Sciences). While he was still employed by AbbVie, and since leaving AbbVie, Stenhouse used this insight to repeatedly solicit senior AbbVie employees to work for him at Exact Sciences.

6.      Stenhouse also owed AbbVie a duty of fidelity and loyalty during his tenure at AbbVie. Stenhouse breached that duty by repeatedly meeting with fellow AbbVie employees and recruiting them to join him at his new company while he was still an AbbVie employee.

7.      Stenhouse's pattern of solicitation of his former employees caused and continues to cause irreparable harm to AbbVie. AbbVie invests tremendous time and money training and developing unique skills in its employees, and suffers not only a loss of its investment in its employees but a disruption to its business when these employees depart. Given the recency of these departures, with the most recent being just weeks ago, AbbVie continues to face a colorable risk of future harm from Stenhouse's actions. This Court should grant a temporary restraining order and a preliminary and permanent injunction to prevent Stenhouse from inflicting further harm on AbbVie.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction under Section 9 of Article VI of the Illinois Constitution.

9.      This Court has personal jurisdiction over the parties to this action pursuant to 735 ILCS 5/2-209. Stenhouse entered into the Agreement and worked as an employee in Lake County, Illinois. As further described below, he caused harm to AbbVie, which has its primary place of business in Lake County, Illinois.

3

10.     Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because Stenhouse and AbbVie negotiated, executed, and in large part performed the contract at issue in this action in Lake County, Illinois.

11.     Venue is also proper in Lake County because, at the time he signed his Agreement, Stenhouse was a resident of Lake Forest, located within Lake County, and he continued to reside in Lake Forest through the term of his employment.  His primary place of business was at AbbVie's headquarters in North Chicago and also out of Mettawa, Illinois, both in Lake County.

12.     Venue is also proper because the employees that were unlawfully solicited to work with Stenhouse were employed in, out of, and by, AbbVie, a Lake County resident.

## PARTIES

13.     AbbVie is a research-based biopharmaceutical company headquartered in North Chicago, Illinois.  AbbVie develops, manufactures, and sells innovative pharmaceutical products. Its business became a successor to Abbott Laboratories ("Abbott") in January 2013.

14.     Mark Stenhouse was hired by Abbott in 1990 and continued to work for Abbott, and then AbbVie, until March 31, 2018.  Most recently, and during all times relevant to this action, he worked at AbbVie's North Chicago headquarters and in Mettawa, Illinois.

## FACTUAL ALLEGATIONS

**A.     Defendant Stenhouse's Contractual Obligations to AbbVie**

15.     Stenhouse started working for Abbott on or about December 9, 1990.  Upon the separation of Abbott's research-based pharmaceutical business into a successor company, AbbVie, in January 2013, Stenhouse worked for AbbVie.  According to Exact Sciences' website: "At Abbott Laboratories/AbbVie, Stenhouse led the sales and marketing teams for one of the most successful pharmaceutical products.  During nearly 30 years at the company, his roles included Vice President, US Immunology, AbbVie, Vice President Gastroenterology, AbbVie."  An

accompanying quote says: "There's nothing more important to me than leading a team of smart people who engage collaboratively and lean in to their mission."

16.     Stenhouse entered into the Agreement with Abbott, on or about August 2012.  A true and correct copy of this Agreement is attached as Exhibit A.  This agreement superseded a 1991 employee agreement between Stenhouse and Abbott.

17.     Stenhouse received adequate consideration for entering into the Agreement. Among other consideration, he continued to work for Abbott and then AbbVie for nearly six years after signing the Agreement.

18.     At the time he entered into the Agreement with Abbott, Stenhouse resided at 1192 Oak Knoll Drive in Lake Forest, Illinois, which is in Lake County.  He continued to reside at this address until selling this house in May 2018.

19.     At the time Stenhouse executed the Agreement, he acknowledged that he was employed "in a position of trust and confidence."  (Agreement, ¶ 1.)

20.     Stenhouse specifically agreed to refrain, both during his employment and for two years thereafter, from soliciting to work for another company those AbbVie employees about whom he acquired knowledge through his employment at AbbVie.  (*Id.* at ¶ 12.)

21.     The exact language of Stenhouse's non-solicitation obligations are contained in Paragraph 12 of the Agreement, reproduced below:

> 12.     EMPLOYEE shall not, during the term of employment with ABBOTT or for a period of two years after termination of employment with ABBOTT, directly or indirectly, for the benefit of EMPLOYEE or others, solicit or assist in soliciting to work as an employee, independent contractor, partner, or otherwise, any employee of ABBOTT about whom EMPLOYEE acquired knowledge through EMPLOYEE's employment with ABBOTT.

22.     On January 1, 2013, Abbott completed the separation of its research-based pharmaceutical business into a new, publicly-traded company, AbbVie.  This business separation transferred Abbott's proprietary pharmaceutical products division to AbbVie, and Abbott assigned

5

the employee agreements of Abbott's employees who were part of that business – including Stenhouse – to AbbVie. AbbVie, as the successor to Abbott's pharmaceutical business, continued to employ Stenhouse under the terms and conditions of the Agreement.

23. The Agreement specifically notes that it "shall inure to the benefit of, be binding upon and be enforceable by ABBOTT, and its successors and assigns and EMPLOYEE and EMPLOYEE's heirs, executors, and administrators." (Agreement, ¶ 16.)

24. The Agreement also provides that it shall be construed "in all respects under the laws of Illinois, without giving effect to conflict of laws." (Agreement, ¶ 17.)

**B. Stenhouse's Career at Abbott/AbbVie**

25. Stenhouse started his employment at Abbott as a sales representative in 1990 and was promoted multiple times into various sales and marketing roles within the Immunology therapeutic area (which included the Gastroenterology organization) while an employee of Abbott and AbbVie.

26. Stenhouse voluntarily terminated his employment with AbbVie on or about March 31, 2018.

27. At the time he left AbbVie, Stenhouse was Vice President for U.S. Immunology. In this role, he led the sales and marketing team for AbbVie's most successful pharmaceutical product, HUMIRA – a top selling medicine in the U.S. and globally. HUMIRA is a biologic that treats many different types of autoimmune diseases in three main therapeutic areas of Immunology – Rheumatology, Gastroenterology, and Dermatology. Each of these therapeutic areas is its own franchise at AbbVie and is part of the overall Immunology business that Stenhouse led and which employs over 900 people.

28. Since 2005, during the course of his employment at AbbVie, Stenhouse witnessed the development and marketing of HUMIRA, including preparing for its launch of the Crohn's

disease indication and the successful roll-out of several other FDA-approved indications – with blockbuster sales growth. The market success of this product was the result of the remarkable women and men whom AbbVie recruited, hired, and cultivated over the course of a decade. Stenhouse worked closely with these employees, particularly during the expansion into new indications and related new marketing campaigns, and gained insight into their unique skills and talents. Stenhouse observed employees not only in sales and marketing, but also in other functions at AbbVie, including medical affairs, research and development, operations, regulatory affairs, commercial operations, and human resources. These employees are integral to AbbVie's overall success, and its future success as it launches new medicines and new marketing campaigns in Immunology and other therapeutic areas. Stenhouse acquired substantial knowledge about AbbVie's employees and their unique skills and experiences through his multiple, senior roles at AbbVie.

29.     On or about February 26, 2018, Stenhouse informed his manager at AbbVie that he intended to leave and join Exact Sciences. His departure was announced to AbbVie employees on or about March 19, 2018.

30.     Stenhouse's last day of work at AbbVie was March 23, 2018. His employment with AbbVie ended on or about March 31, 2018. Stenhouse became Exact Sciences' Cologuard President on April 2, 2018. Kevin Conroy, Chairman of the Board and CEO of Exact Sciences, was quoted in a press release stating "Mark's track record launching and guiding a product to blockbuster status, and his experience in the field of gastrointestinal diseases, makes him the ideal leader."

31.     Cologuard is a physician-prescribed, stool-based colorectal screening test that the FDA approved in 2014. Exact Sciences recently announced several new positions and began

spending millions in the sales and marketing of Cologuard. It also just announced an agreement to co-promote Cologuard with Pfizer Inc. On information and belief, this recent marketing partnership and the corresponding expansion of Cologuard's marketing campaign has prompted Exact Sciences to initiate a hiring push.

32. Stenhouse is responsible for leading the Cologuard commercial functions, including sales, marketing, market access, commercial operations, and medical affairs. On information and belief, this product is heavily marketed to gastroenterologists – the same type of health care professionals to whom Stenhouse helped AbbVie successfully market its medicine for more than a decade, with the assistance of AbbVie's dedicated team of market access and sales representatives, commercial operations leads, and marketers, and the scientific support of AbbVie's medical affairs team.

**C. Defendant's Breach of His Contractual Obligations and Duty of Fidelity and Loyalty**

33. Despite his express non-solicitation obligations to AbbVie, and his 30-plus year obligation to serve AbbVie in a position of trust and confidence, Stenhouse directly and indirectly solicited AbbVie employees to work at Exact Sciences.

34. Stenhouse's attempts to solicit AbbVie employees to join him in his new job at Exact Sciences began while he was an AbbVie employee and continued after he left AbbVie.

35. On information and belief, Stenhouse specifically solicited employees that he worked with at AbbVie in order to benefit from the valuable talents and skills they had obtained and developed while working at AbbVie, including their experience in Gastroenterology and on product launches and new marketing campaigns. His own knowledge of these employees' skills came from working with them at AbbVie.

36.     Since Stenhouse left AbbVie on March 31, 2018, four senior employees have left AbbVie to join him at Exact Sciences: Kristen Weiler, Melanie Hardin, Elizabeth "Kaye" Seagle, and Vic Parker.  These employees had worked for AbbVie and its predecessor Abbott for one or more decades.  All four were in Stenhouse's Immunology business unit, and Stenhouse had directly and/or indirectly managed each of them at some point during their mutual careers at AbbVie.

37.     While Stenhouse was apparently careful to solicit AbbVie employees only via oral and in-person conversations, Melanie Hardin, a Senior Marketing Manager in the Immunology business unit under Stenhouse, recorded details, in a document in her AbbVie email, about Stenhouse's solicitation of her and others to come to Exact Sciences.

38.     Hardin had worked at AbbVie and its predecessor Abbott since approximately July 1995.  Stenhouse worked closely with Hardin at AbbVie and supervised her at certain times, gaining insight about her talents and skills, and took advantage of this knowledge when he decided to recruit her to join Exact Sciences.

39.     On February 28, 2018, nearly a month before Stenhouse's departure was announced to AbbVie employees, Hardin wrote, "Stenhouse just told me he may be leaving AbbVie and wants to take me with him . . .."

40.     On March 9, 2018, Hardin wrote, "Mark [Stenhouse] reached out about dinner next week with a 'select group' of people and I can only surmise he's made the decision to leave.  I have complete peace about doing the same – especially if they buy out my pension."

41.     On March 17, 2018, Hardin wrote about the opportunity to work for Exact Sciences: "The job has tons of appeal, working for Mark [Stenhouse], being given authority and being unleashed . . .."

42.     On March 22, 2018, Stenhouse took Hardin to dinner, as part of his efforts to encourage her to leave AbbVie for Exact Sciences. Hardin wrote: "I had dinner with Mark tonight and it was very revealing.  You saw that he wants me to come with him to his new company – personally.  But he is measured with making no promises (which he shouldn't) and the necessity for me to vet what is 'worth it' for me to leave AbbVie.  I was very assertive in that I didn't want to be another cog in the wheel.  I could have a high profile job and excel – especially if we were building something special.  He concurred I would not be a cog in the wheel."

43.     These notes demonstrate not only that Stenhouse was actively soliciting Hardin to join him at Exact Sciences while he was still working at AbbVie, but that he was providing assurances about what type of job opportunities Hardin would have if she left AbbVie to work with him at Exact Sciences.

44.     Hardin's writings also confirm that Stenhouse continued to solicit her to join Exact Sciences after he left AbbVie.  On April 4, 2018, she wrote that he contacted her about a specific job opportunity at Exact Sciences: "Mark [Stenhouse] reached out to me about an Exact Science job – it wasn't my area of expertise and not reporting to him."

45.     Finally, Hardin's writings indicate that Stenhouse was aware he was violating his contractual obligation not to solicit AbbVie employees to join his new company.  On April 8, 2018, Hardin wrote that "Kaye [Seagle] called me as Mark [Stenhouse] is starting to freak out about the prospect of us getting sued and us all trying to come to Exact [Sciences]."

46.     On or about July 31, 2018, Hardin left AbbVie.  She began working for Exact Sciences in or about August 2018, as Director of HCP Marketing.

47.     On information and belief, Stenhouse directly and indirectly solicited other AbbVie employees in the same manner as he solicited Hardin.

48.    On or about July 7, 2018, Kristen Weiler, a Senior Director of Marketing who worked in Stenhouse's organization, left AbbVie to join Exact Sciences. She had worked at Abbott and then AbbVie since approximately June 1997. She began working for Exact Sciences in or about July 2018, as Vice President of Marketing. In September 2018, Weiler shared Exact Sciences' job opportunities on her LinkedIn page, in a post that said "We're hiring! And we're taking that message across Madison. . . . Interested in a career at Exact Sciences? View our open positions here: https://exas.co/2PHoD2g."

49.    On or about August 15, 2018, Elizabeth "Kaye" Seagle, a Director of Commercial Strategy in the Immunology business unit at AbbVie who worked under Stenhouse, left AbbVie. She had worked at Abbott and then AbbVie since approximately July 2008. She began working for Exact Sciences in or about August 2018, as Director of Marketing Operations.

50.    On or about September 17, 2018, Vic Parker, Sales Director in the Immunology business unit at AbbVie who worked under Stenhouse, left AbbVie. He had worked at Abbott and then AbbVie since approximately September 1995. Parker worked closely with Stenhouse over many years, including in his final role at AbbVie and in his previous role as the Sales Director of Gastroenterology when Stenhouse was the Vice President of Gastroenterology.

51.    On information and belief, Parker works or will work for Exact Sciences as Vice President of Sales. Parker informed his AbbVie manager that Exact Sciences offered him a several-million-dollar compensation package to incentivize him to leave AbbVie. Upon information and belief, prior to leaving AbbVie, Parker communicated with Stenhouse regarding his efforts to solicit non-AbbVie employees to come work for Exact Sciences.

52.    Stenhouse also used social media to solicit AbbVie employees. For example, in or around late March 2018, while still an AbbVie employee, Stenhouse posted on his LinkedIn.com

social media website an announcement from Exact Sciences stating, "We're hiring!  . . . Learn more about careers at Exact Sciences at https://lnkd.in/e934fJQ."  The post included a link to Exact Science's job openings.  On information and belief, Stenhouse has many LinkedIn connections who work at AbbVie, several of whom "liked" this specific post, and he knew that his post would have been visible to them.

53.     On information and belief, Stenhouse has used or directed the use of employment recruiters to help Exact Sciences solicit AbbVie employees.  For example, in or about June 2018 and September 2018, employment recruiters, directed by Exact Sciences, sent unsolicited emails to multiple employees at AbbVie about senior job openings at Exact Sciences.  These emails specifically emphasized that "Mark Stenhouse, formerly of AbbVie, just joined the Company as President."

54.     Stenhouse's repeated solicitation of AbbVie employees to work for Exact Sciences is unlawful, has caused harm for which there is no adequate remedy at law, and continues to cause AbbVie irreparable harm.  The talents and highly specialized skills these employees have in terms of their knowledge of sales and marketing in Gastroenterology and other divisions of Immunology, and their abilities to develop and implement product launches, took years for AbbVie to cultivate. Senior employees who have decades of experience at AbbVie and have developed troves of knowledge about products, product launches and AbbVie's overall business cannot be replaced, and Stenhouse's actions jeopardize AbbVie's ability to meet its business objectives.  AbbVie faces an ongoing risk of harm due to Stenhouse's ongoing solicitation of its employees, most recently leading to a senior employee's departure just weeks ago.

## CAUSES OF ACTION

## COUNT I: BREACH OF EMPLOYEE AGREEMENT

55.     AbbVie incorporates and realleges Paragraphs 1 through 54 as if fully restated herein.

56.     On August 6, 2012, Stenhouse entered into the Agreement with Abbott, which was a valid and enforceable contract.

57.     Abbott and AbbVie, its successor in interest, performed their obligations under the Agreement.

58.     The non-solicitation clause in the Agreement is reasonable in temporal scope and is limited to those employees about whom Stenhouse acquired knowledge through his employment with AbbVie.

59.     Stenhouse breached Paragraph 12 of the Agreement by directly soliciting and/or assisting in soliciting AbbVie employees to work for him at Exact Sciences.

60.     While he was an employee of AbbVie, Stenhouse acquired knowledge about Hardin, Weiler, Seagle, and Parker, all of whom were also AbbVie employees who worked with him.  Stenhouse would not have otherwise acquired this level of knowledge of these employees but for his employment at AbbVie.

61.     Within months of leaving AbbVie, Stenhouse successfully recruited Hardin, Weiler, Seagle, and Parker, all of whom were AbbVie employees at the time, to work at Exact Sciences.

62.     Unless Stenhouse is enjoined from violating the Agreement, AbbVie will suffer irreparable and incalculable harm, including the loss of trained and talented employees for which there is no adequate remedy at law.

## COUNT II: BREACH OF COMMON LAW DUTY OF LOYALTY AND FIDELITY

63.     AbbVie incorporates and realleges Paragraphs 1 through 54 as if fully restated herein.

64.     From December 9, 1990 through March 31, 2018, Stenhouse was an employee of AbbVie and its predecessor Abbott.

65.     As an employee, Stenhouse owed a duty of loyalty and fidelity to his employer, AbbVie.

66.     During his employment, Stenhouse breached this duty of loyalty and fidelity by recruiting his co-workers, including but not limited to Hardin, Weiler, Seagle, and Parker, to work for him at Exact Sciences.

67.     During his employment with AbbVie, Stenhouse unsuccessfully attempted to recruit other co-workers to leave their positions at AbbVie to work at Exact Sciences.

68.     Stenhouse's breach of his duty of loyalty and fidelity has directly and proximately caused AbbVie to suffer actual damages including but not limited to the cost of replacing Hardin, Weiler, Seagle, and Parker and the amount paid to Stenhouse during the time he was soliciting employees for Exact Sciences while still an AbbVie employee.

69.     AbbVie is entitled to compensatory damages for the injuries it suffered as a result of Stenhouse's breach of his fiduciary duty, including but not limited to: AbbVie's lost profits; the compensation AbbVie paid to Stenhouse during the time he was breaching his duty; and the monetary costs associated with replacing the employees whom Stenhouse recruited to Exact Sciences while still an AbbVie employee.

## **RELIEF REQUESTED**

WHEREFORE, AbbVie prays that the Court:

- Grant a temporary restraining order and preliminary and permanent injunctive relief in light of Stenhouse's contractual breaches, by enjoining Stenhouse from directly or indirectly soliciting AbbVie employees to work at Exact Sciences, or otherwise breaching the Agreement;

- Award AbbVie monetary damages from Stenhouse's breach of his duty of fidelity and loyalty; and

- Award AbbVie all such further relief as may be appropriate.


Dated: October 26, 2018

*/s/ Shayna S. Cook*
Shayna S. Cook
ARDC No. 6285959
Alan E. Littmann
ARDC No. 6283389
Michael Casner
ARDC No. 6316585
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
564 West Randolph Street, Suite 400
Chicago, IL 60661
(312) 681-6000
(312) 881-5191
scook@goldmanismail.com
alittmann@goldmanismail.com
mcasner@goldmanismail.com

*Attorneys for Plaintiff AbbVie Inc.*

## **VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedures, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matter the undersigned certifies as aforesaid that she verily believes the same to be true.

Mamta Patel
Vice President, Business Human Resources
U.S. Commercial
AbbVie Inc.

Rome, Italy

### **AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222(B)**

I, Mamta Patel, declare under penalty of perjury that the following is true and correct:

1.　I am employed by AbbVie Inc, headquartered in Lake County, Illinois and have personal knowledge about the above-captioned case.

2.　The total amount of money damages sought exceeds $50,000.

3.　This affidavit is made to comply with Illinois Supreme Court Rule 222(b).

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

Dated: October 24, 2018

_Mamta Patel_

Mamta Patel
Vice President, Business Human Resources
U.S. Commercial
AbbVie Inc.

# EXHIBIT A

Stenhouse, Mark
10098762

## EMPLOYEE AGREEMENT

Agreement made between ABBOTT LABORATORIES, an Illinois corporation, on behalf of itself and its Subsidiaries (as defined below) (collectively, "ABBOTT"), and the undersigned employee ("EMPLOYEE"), WITNESS the following:

EMPLOYEE acknowledges that ABBOTT has the right to protect its good will and interest in Confidential Information (as defined below) and obtain the benefit of certain discoveries, inventions, improvements, and innovations developed by its employees.

In consideration of the execution of this Agreement, the mutual agreements contained in this Agreement and the employment of EMPLOYEE by ABBOTT, the parties agree as follows:

1.      EMPLOYEE is engaged by ABBOTT in a position of trust and confidence in which EMPLOYEE will use, observe, obtain or have access to Confidential Information (as defined below).

2.      As used in this Agreement, the following terms have the meanings specified:

   (a) "ABBOTT Customer" means any person, corporation or any other commercial organization or entity that EMPLOYEE called upon or dealt with for purposes of selling, promoting or marketing a service or product on behalf of ABBOTT during the last two years of EMPLOYEE's employment with ABBOTT.

   (b) "Competing Products" means any product, process or service that has the same or similar purpose or use as a product, process or service researched, discovered, developed, manufactured, imported, marketed, sold, offered for sale or used by ABBOTT, which is related in any way to EMPLOYEE's employment with ABBOTT.

   (c) "Confidential Information" means all discoveries, inventions, improvements and innovations, whether or not patentable or copyrightable, methods, processes, techniques, shop practices, formulae, compounds, compositions, organisms, computer software, equipment, research data, clinical and pharmacological data, marketing, pricing and sales information, personnel data, customer lists, financial data, plans and all other know-how, trade secrets and proprietary information that are in the possession of ABBOTT and that have not been published or disclosed to the general public.  Confidential Information also includes information received by ABBOTT under an obligation of confidentiality to any third party.

   (d) "Subsidiary" means a corporation or any other commercial organization or entity, and any branch or office of any of the foregoing, thirty percent (30%) or more of the assets or voting securities of which is owned or controlled, directly or indirectly, by ABBOTT.

3.      All identification badges, access cards or keys, automobiles, computers or other equipment, memoranda, notes, records, reports, photographs, drawings, plans, papers, computer software, compounds and other documents, products and materials made or compiled by or made available to EMPLOYEE during the course of employment with ABBOTT, and any copies, summaries or abstracts thereof, whether in electronic, paper or other form and whether or not they contain Confidential Information, are and shall be the property of ABBOTT and shall be delivered to ABBOTT by EMPLOYEE prior to termination of employment with ABBOTT.

4.      All discoveries, inventions, improvements, software, innovations, trademarks, trade dress, or Internet domain names, whether or not patentable, copyrightable, or registerable  (including all data and records pertaining thereto) which EMPLOYEE may invent, discover, originate, or conceive during the term of employment with ABBOTT or which may arise out of or result from Confidential Information obtained, provided or otherwise acquired, either directly or indirectly, by EMPLOYEE in connection with EMPLOYEE's employment with ABBOTT, shall be the sole and exclusive property of ABBOTT.  EMPLOYEE shall promptly and fully disclose each and all such discoveries, inventions, improvements, software or innovations to ABBOTT.

5.      EMPLOYEE shall, and does hereby, assign to ABBOTT, EMPLOYEE's entire right, title, and interest to any of the discoveries, inventions, improvements, software, innovations, trademarks, trade dress, and Internet domain names described in Paragraph 4 of this Agreement and any related U.S. or foreign counterparts, including patents, patent applications, copyrights and registrations; shall execute any instruments considered

necessary by ABBOTT to convey or perfect ABBOTT's ownership thereof; and shall assist ABBOTT in obtaining, defending and enforcing its rights therein. ABBOTT shall bear all expenses it authorizes be incurred in connection with such activity and shall pay to EMPLOYEE reasonable compensation for any time spent by EMPLOYEE performing such duties at the request of ABBOTT after termination of employment. In addition, EMPLOYEE shall maintain in confidence any information, including without limitation documents and communications, disclosed to EMPLOYEE after EMPLOYEE's term of employment with ABBOTT in connection with EMPLOYEE's obligations hereunder.

6.      Paragraphs 4 and 5 of this Agreement shall not apply to an invention for which no equipment, supplies, facility or trade secret information of ABBOTT was used and which was developed entirely on EMPLOYEE's own time, unless (a) at the time of completion of reduction to practice the invention relates (1) to the business of ABBOTT or (2) to ABBOTT's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the EMPLOYEE for ABBOTT.

7.      EMPLOYEE understands that ABBOTT has hired EMPLOYEE because of EMPLOYEE's general skills and abilities and not because of EMPLOYEE's possession, if any, of any former employer's, customer's, or other third party's confidential or proprietary information. EMPLOYEE hereby certifies that EMPLOYEE has returned all property, data, and documents, whether in electronic, paper, or other form, of any former employer, customer, or other third party. EMPLOYEE agrees (a) not to disclose or use, directly or indirectly, in furtherance of EMPLOYEE's employment with ABBOTT, any confidential or proprietary information, whether in electronic, paper, or other form, that EMPLOYEE obtained through EMPLOYEE's employment with any previous employer(s) and (b) to comply with and abide by any confidentiality obligations that EMPLOYEE has at the time hired by ABBOTT.

8.      EMPLOYEE shall use all best efforts to protect the secrecy and confidentiality of Confidential Information. Employee shall not, during the term of employment with ABBOTT or thereafter, use or disclose, or assist in the disclosure to others, directly or indirectly, any Confidential Information, except as required and authorized in the scope of EMPLOYEE's job responsibilities and in the furtherance of ABBOTT's business. EMPLOYEE acknowledges that the relationship of EMPLOYEE to ABBOTT with respect to Confidential Information shall be fiduciary in nature.

9.      EMPLOYEE shall not, during the term of employment with ABBOTT or for a period of one year after the termination of employment with ABBOTT, in each country in which ABBOTT conducts business, engage, directly or indirectly, in any activity or employment, for the benefit of Employee or others, in a manner that contributes to any research, discovery, development, manufacture, importation, marketing, promotion, sale or use of one or more Competing Products. This paragraph shall only apply to the extent permitted by the laws of the state in which EMPLOYEE works or worked on behalf of ABBOTT immediately prior to the termination of employment.

10.     EMPLOYEE shall not, during the term of employment with ABBOTT or for a period of one year after the termination of employment with ABBOTT, in each country in which ABBOTT conducts business, engage, directly or indirectly, for the benefit of EMPLOYEE or others, in any activity or employment in the performance of which any Confidential Information obtained, provided or otherwise acquired, directly or indirectly, during the term of employment with ABBOTT is likely to be used or disclosed, notwithstanding EMPLOYEE's undertaking to the contrary. This paragraph shall apply only to the extent permitted by the laws of the state in which EMPLOYEE works on behalf of ABBOTT or worked immediately prior to the termination of employment with ABBOTT, and shall not be construed to limit in any way EMPLOYEE's obligation not to use or disclose Confidential Information as set forth in Paragraph 8 above.

11.     EMPLOYEE shall not, directly or indirectly, during the term of employment with ABBOTT or for a period of one year after termination of employment with ABBOTT, promote or market any Competing Products to any Abbott Customer, or solicit any Abbott Customers for purposes of selling  any Competing Products.

12.     EMPLOYEE shall not, during the term of employment with ABBOTT or for a period of two years after termination of employment with ABBOTT, directly or indirectly, for the benefit of EMPLOYEE or others, solicit or assist in soliciting to work as an employee, independent contractor, partner, or otherwise, any employee of ABBOTT about whom EMPLOYEE acquired knowledge through EMPLOYEE's employment with ABBOTT.

13.     This Agreement shall not be construed to limit in any way any "shop right," "fiduciary duty" or other common law or statutory or contractual rights of ABBOTT, in or to any Intellectual Property or Confidential Information, including without limitation any trade secrets, which ABBOTT has or may have by virtue of EMPLOYEE's employment.

14.     EMPLOYEE is employed at will, meaning either ABBOTT or EMPLOYEE may terminate the employment relationship at any time, with or without notice, and for any reason or no reason at all.

15.     For a period of two years after termination of employment with ABBOTT, EMPLOYEE shall communicate EMPLOYEE's obligations under this Agreement to each subsequent employer(s), including providing to each subsequent employer(s) a copy of this Agreement, and shall advise ABBOTT of the name and address of EMPLOYEE's intended future employer. ABBOTT shall have the right to advise any subsequent employer of EMPLOYEE's obligations hereunder.

16.     If any provision or provisions (or portions thereof) of this Agreement are held to be unenforceable by any court, such provision or provisions (or portions thereof) will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and be enforceable.  This Agreement shall inure to the benefit of, be binding upon and be enforceable by ABBOTT, and its successors and assigns and EMPLOYEE and EMPLOYEE's heirs, executors, and administrators.

17.     This Agreement shall be construed, and its enforceability and the relationship of the parties shall be determined, in all respects under the laws of Illinois, without giving effect to conflict of laws.

18.     EMPLOYEE acknowledges receipt of and agrees to comply with the ABBOTT Code of Business Conduct.

19.     The failure or refusal by ABBOTT either to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a custom or practice contrary to such provision or right of this Agreement.

20.     This Agreement is the sole, entire, and complete agreement of the parties relating to the subject matter hereof, replaces and supersedes all prior versions and representations, and shall apply, notwithstanding that such employment may include significant changes in responsibilities, location, and other terms and conditions, including nature or scope of Confidential Information to which EMPLOYEE has access.  The obligations under this Agreement shall survive termination of employment.

21.     No statements, promises, or representations have been made by any party to the other, or relied upon, other than as expressly provided in this Agreement with respect to the subject matter of the Agreement.  This Agreement (and any provision thereof) may not be modified, changed, clarified or interpreted by the parties, except in a writing specifying the modification, change, clarification or interpretation, and signed by an ABBOTT Corporate Officer and EMPLOYEE.

_Mark Stenhouse_
EMPLOYEE Printed Name

_1192 Oak Knoll Drive_
_Lake Forest IL 60045_
EMPLOYEE Address

_____
City, State, Zip

_____ 8/6/12
ABBOTT WITNESS Signature & DATE

_____ 8/6/2012
EMPLOYEE Signature & DATE

_____
EMPLOYEE SOCIAL SECURITY # or UPI

| **ABBOTT LABORATORIES** *(For CHR Use Only)* |
| By _____ |
| Dated _____ 8/10 _____, 20 12 |

3