# EXHIBIT 2

**FILED**
**10/26/2018 3:36 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ABBVIE INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No.: 18CH00001213 |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MARK STENHOUSE, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

**PLAINTIFF ABBVIE INC.'S EMERGENCY MOTION AND MEMORANDUM**
**OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

LEGAL STANDARD ...................................................................................................... 6

ARGUMENT .................................................................................................................. 7

    A.    AbbVie's Employee Agreement With Defendant Stenhouse Prohibits Solicitation Of AbbVie's Employees ................................................................ 7

    B.    AbbVie Has No Adequate Remedy At Law .......................................................... 9

    C.    AbbVie Will Suffer Irreparable Harm If Stenhouse Is Not Enjoined................................. 10

    D.    AbbVie Is Highly Likely To Prevail On Its Claim That Stenhouse Breached His Non-Solicitation Obligations Under The Agreement ................................. 12

    E.    The Balance Of Hardships Favors AbbVie ........................................................ 15

CONCLUSION................................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allison v. CRC Ins. Svcs., Inc.*,
  2010 WL 2523208 (N.D. Ill. June 21, 2010) ........................................................................ 10

*A-Tech Computer Svcs., Inc. v. Soo Hoo*,
  254 Ill. App. 3d 392 (1993) .................................................................................................. 10

*Bollweg v. Richard Marker Assocs., Inc.*,
  353 Ill. App. 3d 560 (2004) .................................................................................................... 6

*C.G. Caster Co. v. Regan*,
  43 Ill. App. 3d 663 (1976) ...................................................................................................... 8

*Cross Wood Products, Inc. v. Suter*,
  97 Ill. App. 3d 282 (1981) ...................................................................................................... 9

*Cumulus Radio Corp. v. Olson*,
  80 F. Supp. 3d 900 (C.D. Ill. 2015) ..................................................................................... 10

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
  420 F. Supp. 2d 866 (N.D. Ill. 2006) ............................................................................... 8, 11

*Franz v. Calaco Dev. Corp.*,
  322 Ill. App. 3d 941 (2001) .................................................................................................. 10

*Freeman v. Williamson*,
  383 Ill. App. 3d 933 (2008) .................................................................................................... 7

*Hamer Holding Grp., Inc. v. Elmore*,
  202 Ill. App. 3d 994 (1990) .............................................................................................. 9, 10

*Jacob v. C & M Video, Inc.*,
  248 Ill. App. 3d 654 (1993) .................................................................................................... 7

*Keefe-Shea Joint Venture v. City of Evanston*,
  332 Ill. App. 3d 163 (2002) .................................................................................................... 6

*McRand, Inc. v. van Beelen*,
  138 Ill. App. 3d 1045 (1985) .................................................................................................. 8

*Pampered Chef v. Alexanian*,
  804 F. Supp. 2d 765 (N.D. Ill. 2011) ................................................................................... 11

*Scheffel & Co., P.C. v. Fessler*,
  356 Ill. App. 3d 308 (2005) .................................................................................................. 10

ii

*Wolf & Co. v. Waldron*,
  51 Ill. App. 3d 239 (1977) ........................................................................................................ 9

*YTB Travel Network of Ill., Inv. v. McLaughlin*,
  2009 WL 1473779 (S.D. Ill. May 27, 2009)............................................................................. 11

**INTRODUCTION**

Plaintiff AbbVie Inc. seeks a temporary restraining order and preliminary injunction to prevent irreparable harm to its business by Defendant Mark Stenhouse, AbbVie's former employee and Vice President. Stenhouse has an express contractual obligation not to solicit certain employees at AbbVie, the company where he worked for nearly three decades. Nevertheless, Stenhouse has engaged in a repeated and prolonged campaign to recruit AbbVie employees to work for his new employer, Exact Sciences Corporation ("Exact Sciences") – a biotechnology company where he is now the President in charge of its one FDA-approved product, Cologuard. Stenhouse has already recruited four senior employees, and a recently-discovered document proves that he violated his contractual obligations in doing so. The document, authored by one of the solicited employees and stored on AbbVie's computer system, demonstrates that Stenhouse repeatedly and willfully recruited a "select group" of AbbVie employees to join Exact Sciences. The brazenness of his solicitations, and the fact that a senior AbbVie employee who worked under Stenhouse left to join him at Exact Sciences just weeks ago, show that Stenhouse will not abide by his contractual obligations unless enjoined to do so.

Stenhouse worked with, and supervised, numerous highly skilled and talented employees throughout his nearly thirty-year career at AbbVie. Stenhouse rose from a sales representative position to become the Vice President of Immunology, where he led the sales and marketing team for AbbVie's most successful pharmaceutical product, HUMIRA – a top-selling medicine in the U.S. and globally that treats gastroenterology diseases. In 2012, Stenhouse signed an employee agreement that specifically prohibits him from soliciting certain AbbVie employees for the benefit of himself or another company. Stenhouse's unlawful solicitation of his AbbVie subordinates, both during and following his employment at AbbVie, constitutes an express breach of his contractual obligations and has caused, and will continue to cause, unless enjoined,

1

irreparable harm to AbbVie.

At this time, AbbVie seeks an order preserving the status quo and preliminarily enjoining Mr. Stenhouse from soliciting for employment, directly or indirectly, any AbbVie employee about whom he acquired knowledge through his employment at AbbVie. AbbVie further requests that the Court enter a Temporary Restraining Order against Mr. Stenhouse pending a full preliminary injunction hearing.

## **BACKGROUND**

Defendant Mark Stenhouse was employed by AbbVie, and its predecessor company, Abbott Laboratories ("Abbott"), between 1990 and 2018. (Exs. A–B, Employee Agreements; Patel Aff. ¶ 4.) Over that time, Stenhouse was a trusted employee who steadily rose to positions of increasing influence. Ultimately, Stenhouse became Vice President of Immunology (which included the Gastroenterology division), where he led the sales and marketing team for AbbVie's most successful pharmaceutical product, HUMIRA. (Patel Aff. ¶ 5.)

In 2012, Stenhouse entered into a valid Employee Agreement ("Agreement") with Abbott, which superseded a similar agreement from 1991. (Ex. A.) The Agreement states that it "shall be construed, and its enforceability and the relationship of the parties shall be determined, in all respects under the laws of Illinois, without giving effect to conflict of laws." (*Id.* at ¶ 17.) In the Agreement, Stenhouse acknowledged he was employed "in a position of trust and confidence" (*Id.* at ¶ 1) and that he was specifically prohibited from soliciting AbbVie's employees, on behalf of himself or others, while he was employed and for two years thereafter. (*Id.* at ¶ 12.) The exact language of Stenhouse's non-solicitation obligations are contained in Paragraph 12 of the Agreement and state as follows:

> Employee shall not, during the term of employee with ABBOTT or for a period of two years after termination of employment with ABBOTT, directly or indirectly, for the benefit of EMPLOYEE or others, solicit or assist in soliciting to work as an employee,

2

independent contractor, partner, or otherwise, any employee of ABBOTT about whom EMPLOYEE acquired knowledge through EMPLOYEE's employment with ABBOTT.

(*Id.*)    Although the Agreement was executed between AbbVie's predecessor Abbott and Stenhouse, the Agreement specifically states that it extended to Abbott's "successors and assigns."  (*Id.* at ¶16.)  On January 1, 2013, AbbVie became a successor company to Abbott: Abbott separated its research-based pharmaceuticals business, which became AbbVie, and assigned to AbbVie the related employee agreements, including Stenhouse's agreement. Accordingly, Stenhouse became an AbbVie employee.  (Patel Aff. ¶ 8.)

Stenhouse worked closely with numerous talented AbbVie employees, including the remarkable team that developed and marketed HUMIRA and expanded it into new indications. Stenhouse gained critical insight into the unique skills and talents of not only the sales and marketing team, but also employees in medical affairs, research and development, operations, regulatory affairs, commercial operations, and human resources.  These employees are integral to AbbVie's overall success and its future success as it launches new medicines in Gastroenterology and other therapeutic areas, and AbbVie expends significant effort in hiring and retaining the best scientific and business talent in the world.  (Patel Aff. ¶ 9.)

Stenhouse began recruiting from this talented pool of AbbVie employees while still employed at AbbVie and continued to do so following his departure.  He informed his supervisor about his intent to leave AbbVie for Exact Sciences on February 26, 2018.  (Patel Aff. ¶ 11.) Shortly thereafter, Stenhouse was announced as the President of Exact Sciences' Cologuard business, where he is responsible for leading commercial functions including sales, marketing, market access, commercial operations, and medical affairs.  (Ex. C, Exact Sciences Website.) Exact Sciences recently announced an agreement to co-promote Cologuard with Pfizer Inc., with a corresponding expansion of the Cologuard marketing campaign beginning in late 2018, and is

advertising for many open positions in various areas of the company. (Exs. D–E, Exact Sciences Press Release, Health News Article; *see also* Littmann Aff. ¶ 8.)

Stenhouse's employment with AbbVie officially ended on March 31, 2018. (Patel Aff. ¶ 12.) Thus far, Stenhouse has induced four senior employees to leave AbbVie to work for Exact Sciences: Kristin Weiler, Melanie Hardin, Elizabeth "Kaye" Seagle, and Vic Parker. ( *Id.* at ¶ 13.) All of these employees had worked for AbbVie (and/or Abbott) for one or more decades. (*Id.* at ¶ 14.) Parker left AbbVie just weeks ago, in September 2018. (*Id.* at ¶ 23.)

Information recently uncovered by AbbVie demonstrates that Stenhouse made a concerted and prolonged effort to solicit AbbVie employees. For example, over the course of his employment, Stenhouse worked closely with employee Hardin, a Senior Marketing Manager in the Immunology business, supervised her, and gained insight into her talents and skills. (Patel Aff. ¶ 15.) Then, on February 28, 2018, more than a month before Stenhouse left AbbVie, he approached Hardin, informed her he was leaving, and asked her to join him at his new company. (Ex. F, Hardin Journal p. 2.) Hardin recorded evidence of this conversation in an electronic journal that she kept on her company computer. (Patel Aff. ¶ 18.) In her journal, Hardin noted that "Stenhouse just told me he may be leaving AbbVie and wants to take me with him . . .." (Ex. F, p. 2.)[1]

Hardin recorded in her journal numerous other attempts by Stenhouse to recruit her and others at AbbVie. In a March 9, 2018 entry, Hardin wrote that "Mark [Stenhouse] reached out

---

[1] For the protection of its current and former employees' privacy, and due to the highly sensitive nature of certain topics described in the journal, AbbVie will not produce all aspects of Hardin's journal at this time. (Littmann Aff. ¶ 9.) AbbVie will cite throughout this memorandum only to material aspects of the journal and has excluded and/or redacted other aspects that do not implicate the issues in this lawsuit. Additional portions of the journal will be produced to the Court and Defendant, as requested and as necessary.

about dinner next week with a 'select group' of people and I can only surmise he's made the decision to leave. I have complete peace about doing the same – especially if they buy out my pension." (Ex. F, p. 103.) On March 22, 2018, Hardin recounted a dinner where Stenhouse continued to solicit Hardin, and she elaborated on his attempts: "I had dinner with Mark [Stenhouse] tonight and it was very revealing. You saw that he wants me to come with him to his new company – personally." (*Id.* at p. 112.)

While Hardin wrote each of these journal entries prior to Stenhouse's departure from AbbVie, Stenhouse continued soliciting employees after he left AbbVie. Hardin's April 4, 2018 journal entry, written just days after Stenhouse's departure, described how he contacted her about a specific job: "Mark [Stenhouse] reached out to me about an Exact Science job . . .." (Ex. F, p. 120.)

Hardin's journal also provides evidence that Stenhouse solicited other AbbVie's employees. For example, in an April 8, 2018 journal entry, Hardin wrote that "Kaye [Seagle] called me as Mark [Stenhouse] is starting to freak out about the prospect of us getting sued and us all trying to come to Exact [Sciences]." (Ex. F, p. 121.)

In March 2018, while still an AbbVie employee, Stenhouse also shared a post on the widely-used LinkedIn.com social media website, indicating that Exact Sciences was hiring and including a link to the job openings. (Ex. G, Stenhouse LinkedIn Post.) Stenhouse's post ensured that the job openings were visible to Stenhouse's many LinkedIn connections who are AbbVie employees. (Littmann Aff. ¶ 10; *see also* Ex. G at pp. 2–3.)

Stenhouse's solicitation proved successful. Kristen Weiler, a Senior Director of Marketing, left AbbVie on July 7, 2018 to become Vice President of Marketing at Exact Sciences. (Patel Aff. ¶ 19.) Weiler had worked for Abbott, and then AbbVie, since July 1997.

(*Id.* at ¶ 20.)  Hardin left AbbVie on July 31, 2018 and began working shortly thereafter for Exact Sciences as Director of HCP Marketing.  (*Id.* at ¶ 16.)  Elizabeth "Kaye" Seagle, a Director of Commercial Strategy in the U.S. Immunology business unit at AbbVie who had worked under Stenhouse, left AbbVie on August 15, 2018.  (*Id.* at ¶ 21.)  She had worked at Abbott and AbbVie since approximately July 2008 and she began working for Exact Sciences in August 2018 as Director of Marketing Operations.  (*Id.* at ¶ 22.)  Vic Parker, Director of Sales in the Rheumatology franchise within the Immunology business unit at AbbVie who had worked closely with Stenhouse over many years in this franchise as well as the Gastroenterology franchise, left AbbVie on September 17, 2018.  (*Id.* at ¶ 23.)  He had worked at Abbott and AbbVie since approximately September 5, 1995.  (*Id.* at ¶ 24.) Parker informed his AbbVie supervisor that he would become Vice President of Sales at Exact Sciences.  (*Id.* at ¶ 25.)

## LEGAL STANDARD

"A preliminary injunction is intended to preserve the status quo pending a decision on the merits of a case."  *Bollweg v. Richard Marker Assocs., Inc.*, 353 Ill. App. 3d 560, 572 (2004).  To obtain an injunction a plaintiff must demonstrate that (1) it possesses a clear right or interest needing protection; (2) it has no adequate remedy at law; (3) it will suffer irreparable harm if the preliminary injunction is not granted; and (4) there is a reasonable likelihood of success on the merits.  *Id.*  Courts must also balance the hardships to the parties.  *Id.*  *See also Keefe-Shea Joint Venture v. City of Evanston*, 332 Ill. App. 3d 163, 169 (2002).  "A plaintiff seeking a preliminary injunction does not carry the same burden of proof that is required to prevail on the ultimate issue."  *Bollweg*, 353 Ill. App. 3d at 572.  Rather, a plaintiff need only make a *prima facie* showing regarding the existence of the claimed right and "a reasonable belief that the plaintiff will be entitled to the relief sought."  *Id.*  "A temporary restraining order issued with notice and a preliminary injunction issued with notice are the same type of relief and, whether referred to

under either term, require the same elements of proof." *Jacob v. C & M Video, Inc.*, 248 Ill. App. 3d 654, 664 (1993).

Illinois law controls this action. Here, the Agreement states that it "shall be construed, and its enforceability and the relationship of the parties shall be determined, in all respects under the laws of Illinois, without giving effect to conflict of laws." (Ex. A, ¶ 17.) Illinois courts routinely enforce express choice-of-law provisions. *See Freeman v. Williamson*, 383 Ill. App. 3d 933, 938 (2008).

## ARGUMENT

Stenhouse has willfully violated the express terms of his Agreement with AbbVie. He has solicited, and continues to solicit, AbbVie employees to work with him at another company in direct contravention of his non-solicitation obligation. These actions have caused AbbVie harm, for which there is no adequate remedy at law, by depriving AbbVie of key elements of its talented and experienced workforce. If Stenhouse is not enjoined from further violations of the Agreement, AbbVie will suffer irreparable harm to its workforce and its ability to use this talent to launch new medicines and indications for existing medicines.

**A.    AbbVie's Employee Agreement With Defendant Stenhouse Prohibits Solicitation Of AbbVie's Employees**

AbbVie possesses a clear, protectable interest in prohibiting Stenhouse from soliciting the talented members of AbbVie's workforce. Stenhouse has a contractual obligation not to "solicit or assist in soliciting to work as an employee, independent contractor, partner, or otherwise, any employee" of AbbVie within two years of leaving about whom he "acquired knowledge" through his employment at AbbVie. (Ex. A, ¶ 12; *id.* at ¶ 16 (confirming obligation remained binding following creation of AbbVie from Abbott in 2013).)

Illinois courts routinely uphold non-solicitation clauses and other restrictive covenants

like that at issue here, holding that the question of "whether a restrictive employment covenant is enforceable is one of law and depends upon the reasonableness of its terms." *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1051 (1985). "The basic test is whether the covenant is reasonably necessary to protect the interests of the employer." *Id.*

Here, the Agreement is reasonable and limited in scope in several important ways. First, it is temporally limited to "during the term of employment" and "for a period of two years after termination of employment." Illinois courts frequently hold that two years is a reasonable restriction when upholding a restrictive covenant. *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866 (N.D. Ill. 2006) (applying Illinois law in upholding a two-year restriction on soliciting employees); *C.G. Caster Co. v. Regan*, 43 Ill. App. 3d 663, 667 (1976) (upholding two-year non-compete clause). As applied here, two years is particularly reasonable in light of the fact that AbbVie invests considerable time hiring and retaining key employees. (Patel Aff. ¶ 10.) AbbVie's employees develop specific skills and institutional knowledge that makes replacing them incredibly difficult. Yet, despite this tremendous cost to the company, the Agreement is narrowly tailored to reflect a balance between the interests of AbbVie, its employees, and the public. AbbVie recognizes that job functions and expertise change over the course of employment and a specific skill that exists in Year 5 of employment may have changed by Year 7. Yet, within those years, a former employee will likely be familiar with his/her former colleagues' expertise and could attempt to exploit that knowledge for their own, or their new employer's, benefit. By limiting the restriction to two years, the Agreement is related to AbbVie's interests and reasonable in terms of its impact on the parties and the public.

The Agreement is also limited in scope because it only prohibits Stenhouse from

8

soliciting any AbbVie employee "about whom [he] acquired knowledge through [his] employment" with AbbVie. (Ex. A, ¶ 12.) Stenhouse worked for AbbVie and its predecessor Abbott for nearly 30 years. He interacted closely with numerous AbbVie employees and, through his work at AbbVie, he learned about those employees' skills and expertise. However, the Agreement's non-solicitation provision is expressly limited and does not extend beyond those about whom he acquired knowledge through his employment. Rather, the Agreement expressly excludes the vast majority of AbbVie's tens of thousands of employees. There is no question, therefore, that Stenhouse can solicit most of AbbVie's employees. He cannot, however, solicit those employees that he acquired knowledge of through his employment and thereby use the benefits he received from AbbVie to compete against it.

## B.      AbbVie Has No Adequate Remedy At Law

A remedy at law is adequate only if it is "clear, complete and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy." *Cross Wood Products, Inc. v. Suter*, 97 Ill. App. 3d 282, 286 (1981). Courts recognize that damages to business interests can be impossible to quantify, necessitating injunctive relief. *See Wolf & Co. v. Waldron*, 51 Ill. App. 3d 239, 243 (1977) ("prolonged interruptions in the continuity of business relationships can cause irremedial damages for which no compensation would be adequate."). There can also be no adequate remedy at law "where there is evidence that the plaintiff will be subject to constant and frequent transgressions of a continuing nature." *Hamer Holding Grp., Inc. v. Elmore*, 202 Ill. App. 3d 994, 1012 (1990) (reversing trial court's denial of injunction involving covenant not to compete).

Violations of restrictive covenants frequently result in the sort of damage for which money damages are inadequate. Although the violation of a restrictive covenant may result in concrete damages that can be remedied by money damages, "the injury to [] reputation and

goodwill, as well as the resulting potential loss of future business, is incapable of adequate computation." *Scheffel & Co., P.C. v. Fessler*, 356 Ill. App. 3d 308, 314 (2005); *see also A-Tech Computer Svcs., Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 401 (1993) ("loss of competitive position is intangible, incapable of being measured"). It is "virtually impossible to quantify the damage to goodwill, loss of reputation, and impact on the remaining [] employees" caused by the loss of employees to a competitor. *Allison v. CRC Ins. Svcs., Inc.*, No. 10 C 3313, 2010 WL 2523208, at *6 (N.D. Ill. June 21, 2010). And "competition changes probabilities, a fact that makes it difficult for businesses to easily identify which contracts slipped from its grasp." *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 912 (C.D. Ill. 2015) (quotations and alterations omitted).

Here, AbbVie's losses cannot be adequately quantified in money damages. Stenhouse has already recruited away four senior members of AbbVie's Immunology team to work at Exact Sciences. Even if their positions can be filled, there is no way to entirely account for the loss to AbbVie by their departure. These employees had a collective 70 years of experience at AbbVie, had familiarity with AbbVie's products, product launches, and business models, including of its most successful product, and had long-standing relationships with clients and other employees. This is precisely the sort of damage the *Allison* court held was "virtually impossible to quantify." 2010 WL 2523208, at *6. Additionally, AbbVie believes that Stenhouse continues to solicit other AbbVie employees to work for Exact Sciences, subjecting it to the sort of "constant and frequent transgressions of a continuing nature" for which there can be no adequate remedy at law. *Hamer*, 202 Ill. App. 3d at 1012. AbbVie is therefore entitled to injunctive relief.

## C.     AbbVie Will Suffer Irreparable Harm If Stenhouse Is Not Enjoined

Irreparable harm occurs when "the remedy at law is inadequate, meaning that monetary damages cannot adequately compensate the injury and the injury cannot be measured by pecuniary standards." *Franz v. Calaco Dev. Corp.*, 322 Ill. App. 3d 941, 947 (2001). When an

employee recruits co-workers away from his former employer, that employer suffers irreparable harm in terms of lost "goodwill, competitive position, and continuity of business relationships with its customers and employees." *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 804 (N.D. Ill. 2011) (applying Illinois law). "Such harm is oftentimes fatal to businesses." *Diamond Blade*, 420 F. Supp. 2d at 872 (applying Illinois law).

AbbVie stands to suffer irreparable harm in at least two ways if Stenhouse is not enjoined from continuing to breach the Agreement. First, AbbVie is likely to be deprived of the services of experienced employees who have spent decades developing and marketing AbbVie's products, including the blockbuster HUMIRA. AbbVie has spent countless time and money identifying, recruiting, hiring, and training some of the most talented employees in the world. An employee that is illegally solicited cannot simply be replaced by hiring a new employee. Rather, the loss of institutional knowledge and experience can be replaced, if at all, only through additional decades of training. *See YTB Travel Network of Ill., Inv. v. McLaughlin*, No. 09-cv-369-JPG, 2009 WL 1473779, at *4 (S.D. Ill. May 27, 2009) (granting temporary restraining order, agreeing that plaintiff will suffer irreparable harm by defendant "recruiting away its seasoned staff"). Stenhouse is particularly well suited to identify those employees that have benefitted the most from their training and experience at AbbVie. He was in a position of trust and authority and worked for many years supervising and working with many of AbbVie's key employees, including the talented sales and marketing teams for HUMIRA.

Second, AbbVie will suffer irreparable harm because the loss of key employees will cause disruptions to the business and loss of key institutional knowledge and know-how. AbbVie is a pharmaceutical company that invests heavily in developing and marketing revolutionary treatments. Stenhouse already has recruited away four senior members of

11

AbbVie's Immunology sales and marketing staff, who had decades of experience in Gastroenterology, including on product launches and new marketing campaigns. AbbVie's projects are highly time-sensitive and a delay in releasing a marketing strategy, for example, could cause an irreversible loss of revenue and goodwill. (Patel Aff. ¶ 26.) Here, again, Stenhouse is well situated to identify key employees and disrupt AbbVie's critical deliverables. If not enjoined, his active solicitation of employees and promises of greener pastures will continue to cause long-lasting, irreparable harm to AbbVie.

**D.      AbbVie Is Highly Likely To Prevail On Its Claim That Stenhouse Breached His Non-Solicitation Obligations Under The Agreement**

AbbVie has uncovered concrete evidence that Stenhouse has breached the terms of his non-solicitation agreement. While defendants are often loath to put evidence of their willful contractual breaches in writing, in this unique situation, AbbVie recently located a journal on a company computer that details Stenhouse's solicitation of multiple AbbVie employees both during and immediately after his employment at AbbVie. The journal's author, former employee Melanie Hardin, recorded Stenhouse's repeated attempts to solicit her and others to work with him at Exact Sciences. To note just a few examples, Hardin recorded the following:

- <u>February 28, 2018</u>: "Stenhouse just told me he may be leaving AbbVie and wants to take me with him…"

- <u>March 9, 2018</u>: that "Mark [Stenhouse] reached out about dinner next week with a 'select group' of people and I can only surmise he's made the decision to leave. I have complete peace about doing the same – especially if they buy out my pension."

- <u>March 22, 2018</u>: "I had dinner with Mark [Stenhouse] tonight and it was very revealing. You saw that he wants me to come with him to his new company – personally. But he is measured with making no promises (which he shouldn't) and the necessity for me to vet what is 'worth it' for me to leave AbbVie. I was very assertive in that I didn't want to be another cog in the wheel. I could have a high profile job and excel – especially if we were building something special. He concurred I would not be a cog in the wheel."

- <u>April 4, 2018</u>: "Mark [Stenhouse] reached out to me about an Exact Science job – it wasn't my area of expertise and not reporting to him."

- April 8, 2018: "Kaye [Seagle] called me as Mark [Stenhouse] is starting to freak out about the prospect of us getting sued and us all trying to come to Exact [Sciences]."

(Ex. F, pp. 2, 103, 112, 120, 121.)[2]

These journal entries prove each element of Stenhouse's breach of the Agreement. First, Stenhouse "acquired knowledge" of Hardin because she was a long-time employee who had become a Senior Marketing Manager in AbbVie's Immunology business—the business unit that reported to Stenhouse. Hardin specifically notes that Stenhouse is soliciting a "select group" of people that he knows and that "he wants me…. personally." (*Id.* at p. 112.) Second, Hardin was an "employee": Hardin worked at Abbott, and then its successor AbbVie, since approximately July 1995 and was still employed with AbbVie when Stenhouse solicited her. (Patel Aff. ¶17.) Her March 22 entry notes that she is considering whether "to leave AbbVie." (Ex. F, p. 112.) Third: As shown above through her own descriptions of key events, Stenhouse unquestionably solicited her to work "for the benefit of" him and his new company, Exact Sciences. She notes on April 4 that "Mark [Stenhouse] reached out to me about an Exact Science job." (*Id.* at p. 120.) Finally, Stenhouse's actions occurred during his "term of employment" or "for a period of two years after termination of employment." Each date in the entries above falls within this range, including the February 28 entry where Hardin notes that "Stenhouse just told me he may be leaving AbbVie and wants to take me with him . . .." (*Id.* at p. 103.) Hardin ultimately left AbbVie to join Stenhouse at Exact Sciences in July 2018. (Patel Aff. ¶16.) These facts alone are sufficient to establish that AbbVie is highly likely to prevail on the merits.

Stenhouse's breach was not limited to his conversations with Hardin. As Hardin noted in her journal, Stenhouse reached out to a "select group." In addition, other highly sensitive, and

---

[2] AbbVie did not delay in bringing this motion. Hardin's journal was only recently discovered. (Patel Aff. ¶ 18.)

personal, aspects of her journal provide concrete evidence that additional AbbVie employees were solicited both directly and indirectly. (Littmann Aff. ¶9.)[3] Stenhouse also shared information about open positions at Exact Sciences using the LinkedIn social media website while he was still an AbbVie employee. (Ex. G.) Stenhouse, a sophisticated marketing and sales professional, surely knew that posting this announcement would make it visible to his many LinkedIn connections who work at AbbVie, several of whom "liked" his post. (*Id*. at pp. 2–3.)

While Hardin's journal entries ended in April 2018, Stenhouse's attempts to recruit employees apparently did not. She and several other employees left AbbVie to join Stenhouse at Exact Sciences in the months that followed, including Parker, who left AbbVie just over a month ago. (Patel Aff. ¶ 24.) Each of these individuals was a long-time AbbVie employee who had worked closely with Stenhouse at AbbVie. (*Id*. at ¶¶ 13–14.) These departures reflect that Stenhouse's repeated, ongoing breaches of his employee agreement have caused lasting harm.

Stenhouse's pattern and practice, described throughout Hardin's journal, of clandestine meetings and private dinners, shows that he was well aware of how his actions conflicted with his contractual obligations and that he took care to cover up any evidence of breach. But for Hardin's journal, AbbVie would have had little direct evidence of Stenhouse's machinations. The fact that the journal entries ended in April does not mean Stenhouse's actions stopped with them. To the contrary, his behavior shows that he was willing to brazenly solicit AbbVie employees ***while currently working*** at AbbVie. Now, removed from the immediate threat of someone overhearing, it would be safe for the Court and AbbVie to conclude that his activities have not only continued, but perhaps intensified. This conclusion is reasonable and can be

---

[3] The citation here is to a declaration of AbbVie's attorney. As discussed above, AbbVie will make additional details of the journal available upon the Court's request.

confirmed by seemingly innocuous evidence, such as unsolicited recruiter emails that were sent to multiple employees at AbbVie. (Ex. H, Emails.) These emails specifically listed senior level jobs at Exact Sciences and emphasized that Mark Stenhouse—formerly at AbbVie—is now working there. It is altogether reasonable to assume that Stenhouse, or someone acting on his behalf, directed these emails to specific employees to solicit them.

The evidence compiled at this early stage is overwhelming that Stenhouse has breached his non-solicitation obligations in the Agreement. AbbVie is highly likely to succeed on the merits and has satisfied its burden in establishing the need for a TRO and preliminary injunction.

**E.      The Balance Of Hardships Favors AbbVie**

The balance of hardships unquestionably favors AbbVie. As described above, Stenhouse's actions have caused AbbVie irreparable harm and will continue to do so by depriving it of the services of its talented, experienced employees. An injunction against Stenhouse, on the other hand, causes almost no hardship whatsoever. Stenhouse has recruited four AbbVie employees and has left AbbVie to lead a significant business. AbbVie is not asking for any restriction on his ability to work or carry out his job functions, but only that he be enjoined from soliciting any additional AbbVie employees about whom he acquired knowledge through his employment with Abbott and AbbVie.

<u>**CONCLUSION**</u>

For these reasons, AbbVie respectfully requests that the Court enter an order temporarily restraining Stenhouse from soliciting or assisting in soliciting to work as an employee, independent contractor, partner, or otherwise, directly or indirectly, for the benefit of himself or others, any AbbVie employee about whom he acquired knowledge through his employment with Abbott or AbbVie. AbbVie further requests the Court enter an order for expedited discovery and set a preliminary injunction hearing on the earliest possible date.

Dated: October 26, 2018

/s/ Shayna S. Cook
Shayna S. Cook
ARDC No. 6285959
Alan E. Littmann
ARDC No. 6283389
Michael Casner
ARDC No. 6316585
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
564 West Randolph Street, Suite 400
Chicago, IL 60661
(312) 681-6000
(312) 881-5191
scook@goldmanismail.com
alittmann@goldmanismail.com
mcasner@goldmanismail.com

*Attorneys for Plaintiff AbbVie Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of **PLAINTIFF ABBVIE INC.'S EMERGENCY MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** has been served on October 26, 2018, upon the following via U.S. Mail:

Mark Stenhouse
647 Summit Rd
Madison, WI 53704


*/s/ Shayna S. Cook*
Shayna S. Cook
ARDC No. 6285959

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ABBVIE INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No.: |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MARK STENHOUSE, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

### AFFIDAVIT OF MAMTA PATEL IN SUPPORT OF ABBVIE'S
### MOTION FOR A TEMPORARY RESTRAINING ORDER
### AND PRELIMINARY INJUNCTION

Rome, Italy

I, Mamta Patel, declare under penalty of perjury that the following is true and correct:

1.     I submit this affidavit in support of the Motion for Preliminary Injunction in the above-captioned matter. Except as otherwise stated herein, this affidavit is based upon my personal knowledge.

2.     I am the Vice President, Business Human Resources, US Commercial at AbbVie Inc. I began working at Abbott, AbbVie's predecessor company, in 2009 and became an employee of AbbVie when it was created in January 2013.

3.     I am over 18 years of age and competent to make this affidavit. If called to testify as a witness in this matter, I could and would testify truthfully to each of the statements contained herein.

4.      Mark Stenhouse was employed by AbbVie, and its predecessor company, Abbott Laboratories, between 1990 and 2018.

5.      Stenhouse was ultimately promoted to the position of Vice President of Immunology (which included the Gastroenterology division), where he led the sales and marketing team for AbbVie's most successful pharmaceutical product, HUMIRA – a top selling medicine in the U.S. and globally – that treats many different types of autoimmune diseases.

6.      On August 6, 2012, Stenhouse executed a new employment agreement with Abbott Laboratories that superseded his earlier employment agreement. A true and correct copy of this employment agreement is attached hereto as Exhibit A.

7.      On January 18, 1991, Stenhouse executed an employment agreement with Abbott Laboratories.  A true and correct copy of this employment agreement is attached hereto as Exhibit B

8.      On January 1, 2013, AbbVie became a successor company to Abbott Laboratories.  Abbott separated its research-based pharmaceuticals business, which became AbbVie Inc., and assigned to AbbVie Inc. the employee agreements it had with employees of that business, including Stenhouse.  Accordingly, Stenhouse became an AbbVie employee on January 1, 2013.

9.      Stenhouse worked closely with numerous talented employees while at AbbVie, including the individuals who developed and marketed HUMIRA, which became the best-selling pharmaceutical product in the world.  Stenhouse worked with the HUMIRA team as it developed new indications and gained expertise in medical affairs, research and development, operations, regulatory affairs, commercial operations, and human resources.  The employees at AbbVie,

2

including those on the HUMIRA team, are integral to AbbVie's overall success and its future success as it launches new medicines in Gastroenterology and other therapeutic areas.

10.     AbbVie expends significant time and money hiring and retaining the best scientific and business talent in the world.

11.     Stenhouse informed his supervisor about his intent to leave AbbVie for Exact Sciences Corporation on February 26, 2018.

12.     Stenhouse's employment with AbbVie officially ended on March 31, 2018.

13.     Four senior AbbVie employees who had worked with Stenhouse have left AbbVie to work for Exact Sciences: Kristin Weiler, Melanie Hardin, Elizabeth "Kaye" Seagle, and Vic Parker.

14.     All four of the employees listed in Paragraph 13 above had worked for AbbVie (and/or Abbott) for one or more decades.

15.     Over the course of his employment at AbbVie, Stenhouse worked closely with, and supervised, Melanie Hardin, a Senior Marketing Manager in the Immunology business.

16.     Hardin ultimately left AbbVie on July 31, 2018 and is now working for Exact Sciences as Director of HCP Marketing.

17.     Hardin had worked at Abbott, and then its successor AbbVie, since approximately July 1995 and was still employed with AbbVie in April 2018.

18.     Hardin's journal was discovered on AbbVie's computers just a couple of weeks prior to AbbVie bringing this motion.

19.     Kristen Weiler, a Senior Director of Marketing, left AbbVie on July 7, 2018 to become Vice President of Marketing at Exact Sciences.

3

20.     Weiler had worked for Abbott, and then AbbVie, since July 1997. She had worked closely with Stenhouse during at least a portion of that time, including as part of the HUMIRA team.

21.     Elizabeth "Kaye" Seagle, a Director of Commercial Strategy in the U.S. Immunology business unit at AbbVie who had worked under Stenhouse, left AbbVie on August 15, 2018.

22.     Seagle had worked at Abbott and then AbbVie since July 2008.  She began working for Exact Sciences in August 2018 as Director of Marketing Operations.

23.     Vic Parker, Director of Sales in the Rheumatology franchise within the Immunology business unit at AbbVie left AbbVie on September 17, 2018.  Parker had worked closely with Stenhouse over many years in this franchise as well as the Gastroenterology franchise.

24.     Parker had worked at Abbott and AbbVie since approximately September 5, 1995.

25.     I have been informed that Parker told his supervisor at AbbVie that he took a job at Exact Sciences and would become Vice President of Sales after his departure from AbbVie.

26.     AbbVie's projects are highly time-sensitive and a delay in releasing a marketing strategy, for example, could cause an irreversible loss of revenue and goodwill.


        Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

4

Dated: October 24, 2018

Mamta Patel
Vice President, Business Human Resources
U.S. Commercial
AbbVie Inc.

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ABBVIE INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No.:  18CH00001213 |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MARK STENHOUSE, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

**AFFIDAVIT OF ALAN LITTMANN IN SUPPORT OF**
**ABBVIE'S MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

STATE OF ILLINOIS,
COUNTY OF COOK

I, Alan Littmann, declare under penalty of perjury that the following is true and correct:

1.      I am a Partner at the law firm of Goldman Ismail Tomaselli Brennan & Baum.  I represent Plaintiff AbbVie Inc. ("AbbVie") in this matter.

2.      I submit this affidavit in support of AbbVie's Motion for a Temporary Restraining Order and Preliminary Injunction in the above-captioned matter. Except as otherwise stated herein, this affidavit is based upon my personal knowledge.

3.      I am over 18 years of age and competent to make this affidavit.  If called to testify as a witness in this matter, I could and would testify truthfully to each of the statements contained herein.

4.      Attached as **Exhibit A** is a true and correct copy of the employee agreement between Defendant Mark Stenhouse and Abbott Laboratories dated August 6, 2012.

5.      Attached as **Exhibit B** is a true and correct copy of the employee agreement between Defendant Mark Stenhouse and Abbott Laboratories dated January 18, 1991.

6.      Attached as **Exhibit C** is a true and correct copy of a printout from Exact Sciences' website including Defendant Mark Stenhouse's profile page and an announcement of his appointment as President of the Cologuard business.

7.      Attached as **Exhibit D** is a true and correct copy of a printout of Exact Sciences' website announcing its agreement with Pfizer Inc. to co-promote Cologuard.

8.      Attached as **Exhibit E** is a true and correct copy of a printout of Reuters Health News website with an article entitled *Exact Sciences surges after marketing deal with Pfizer for cancer test* dated August 22, 2018.

9.      Attached as **Exhibit F** is a true and correct copy of redacted excerpts from an electronic journal entered into an AbbVie computer by former AbbVie employee Melanie Hardin, who is not a party to this action.  The electronic journal resided on AbbVie's computers. I have reviewed the electronic journal and can attest that the statements made in AbbVie's Complaint and Memorandum regarding the journal are accurate and do not mischaracterize the evidence contained therein.  Due to the highly sensitive nature of certain topics described in the journal, AbbVie does not believe it serves the public interest to produce the journal in its entirety at this time.  I can attest that the journal provides concrete evidence that additional AbbVie employees were solicited both directly and indirectly to work at Exact Sciences, but to protect their privacy, details of their solicitation have been redacted.  Additional portions of the journal will be produced to the Court and Defendant, as requested and necessary.

10.      Attached as **Exhibit G** is a true and correct copy of a printout from Defendant Mark Stenhouse's online LinkedIn social media webpage, posting an announcement from Exact Sciences indicating they were hiring for various positions and including a link to the job openings.

11.     Attached as **Exhibit H** is a true and correct copy of several recruiter emails that were sent to multiple employees at AbbVie advertising job openings at Exact Sciences and emphasizing that Defendant Mark Stenhouse is now working there.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

Dated:  October 26, 2018                                  /s/ Alan Littmann
                                                          Alan Littmann

# EXHIBIT A

Stenhouse, Mark
10098762

EMPLOYEE AGREEMENT

Agreement made between ABBOTT LABORATORIES, an Illinois corporation, on behalf of itself and its Subsidiaries (as defined below) (collectively, "ABBOTT"), and the undersigned employee ("EMPLOYEE"), WITNESS the following:

EMPLOYEE acknowledges that ABBOTT has the right to protect its good will and interest in Confidential Information (as defined below) and obtain the benefit of certain discoveries, inventions, improvements, and innovations developed by its employees.

In consideration of the execution of this Agreement, the mutual agreements contained in this Agreement and the employment of EMPLOYEE by ABBOTT, the parties agree as follows:

1.     EMPLOYEE is engaged by ABBOTT in a position of trust and confidence in which EMPLOYEE will use, observe, obtain or have access to Confidential Information (as defined below).

2.     As used in this Agreement, the following terms have the meanings specified:

   (a) "ABBOTT Customer" means any person, corporation or any other commercial organization or entity that EMPLOYEE called upon or dealt with for purposes of selling, promoting or marketing a service or product on behalf of ABBOTT during the last two years of EMPLOYEE's employment with ABBOTT.

   (b) "Competing Products" means any product, process or service that has the same or similar purpose or use as a product, process or service researched, discovered, developed, manufactured, imported, marketed, sold, offered for sale or used by ABBOTT, which is related in any way to EMPLOYEE's employment with ABBOTT.

   (c) "Confidential Information" means all discoveries, inventions, improvements and innovations, whether or not patentable or copyrightable, methods, processes, techniques, shop practices, formulae, compounds, compositions, organisms, computer software, equipment, research data, clinical and pharmacological data, marketing, pricing and sales information, personnel data, customer lists, financial data, plans and all other know-how, trade secrets and proprietary information that are in the possession of ABBOTT and that have not been published or disclosed to the general public.  Confidential Information also includes information received by ABBOTT under an obligation of confidentiality to any third party.

   (d) "Subsidiary" means a corporation or any other commercial organization or entity, and any branch or office of any of the foregoing, thirty percent (30%) or more of the assets or voting securities of which is owned or controlled, directly or indirectly, by ABBOTT.

3.     All identification badges, access cards or keys, automobiles, computers or other equipment, memoranda, notes, records, reports, photographs, drawings, plans, papers, computer software, compounds and other documents, products and materials made or compiled by or made available to EMPLOYEE during the course of employment with ABBOTT, and any copies, summaries or abstracts thereof, whether in electronic, paper or other form and whether or not they contain Confidential Information, are and shall be the property of ABBOTT and shall be delivered to ABBOTT by EMPLOYEE prior to termination of employment with ABBOTT.

4.     All discoveries, inventions, improvements, software, innovations, trademarks, trade dress, or Internet domain names, whether or not patentable, copyrightable, or registerable  (including all data and records pertaining thereto) which EMPLOYEE may invent, discover, originate, or conceive during the term of employment with ABBOTT or which may arise out of or result from Confidential Information obtained, provided or otherwise acquired, either directly or indirectly, by EMPLOYEE in connection with EMPLOYEE's employment with ABBOTT, shall be the sole and exclusive property of ABBOTT.  EMPLOYEE shall promptly and fully disclose each and all such discoveries, inventions, improvements, software or innovations to ABBOTT.

5.     EMPLOYEE shall, and does hereby, assign to ABBOTT, EMPLOYEE's entire right, title, and interest to any of the discoveries, inventions, improvements, software, innovations, trademarks, trade dress, and Internet domain names described in Paragraph 4 of this Agreement and any related U.S. or foreign counterparts, including patents, patent applications, copyrights and registrations; shall execute any instruments considered

necessary by ABBOTT to convey or perfect ABBOTT's ownership thereof; and shall assist ABBOTT in obtaining, defending and enforcing its rights therein. ABBOTT shall bear all expenses it authorizes be incurred in connection with such activity and shall pay to EMPLOYEE reasonable compensation for any time spent by EMPLOYEE performing such duties at the request of ABBOTT after termination of employment. In addition, EMPLOYEE shall maintain in confidence any information, including without limitation documents and communications, disclosed to EMPLOYEE after EMPLOYEE's term of employment with ABBOTT in connection with EMPLOYEE's obligations hereunder.

6.      Paragraphs 4 and 5 of this Agreement shall not apply to an invention for which no equipment, supplies, facility or trade secret information of ABBOTT was used and which was developed entirely on EMPLOYEE's own time, unless (a) at the time of completion of reduction to practice the invention relates (1) to the business of ABBOTT or (2) to ABBOTT's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the EMPLOYEE for ABBOTT.

7.      EMPLOYEE understands that ABBOTT has hired EMPLOYEE because of EMPLOYEE's general skills and abilities and not because of EMPLOYEE's possession, if any, of any former employer's, customer's, or other third party's confidential or proprietary information. EMPLOYEE hereby certifies that EMPLOYEE has returned all property, data, and documents, whether in electronic, paper, or other form, of any former employer, customer, or other third party. EMPLOYEE agrees (a) not to disclose or use, directly or indirectly, in furtherance of EMPLOYEE's employment with ABBOTT, any confidential or proprietary information, whether in electronic, paper, or other form, that EMPLOYEE obtained through EMPLOYEE's employment with any previous employer(s) and (b) to comply with and abide by any confidentiality obligations that EMPLOYEE has at the time hired by ABBOTT.

8.      EMPLOYEE shall use all best efforts to protect the secrecy and confidentiality of Confidential Information. Employee shall not, during the term of employment with ABBOTT or thereafter, use or disclose, or assist in the disclosure to others, directly or indirectly, any Confidential Information, except as required and authorized in the scope of EMPLOYEE's job responsibilities and in the furtherance of ABBOTT's business. EMPLOYEE acknowledges that the relationship of EMPLOYEE to ABBOTT with respect to Confidential Information shall be fiduciary in nature.

9.      EMPLOYEE shall not, during the term of employment with ABBOTT or for a period of one year after the termination of employment with ABBOTT, in each country in which ABBOTT conducts business, engage, directly or indirectly, in any activity or employment, for the benefit of Employee or others, in a manner that contributes to any research, discovery, development, manufacture, importation, marketing, promotion, sale or use of one or more Competing Products. This paragraph shall only apply to the extent permitted by the laws of the state in which EMPLOYEE works or worked on behalf of ABBOTT immediately prior to the termination of employment.

10.     EMPLOYEE shall not, during the term of employment with ABBOTT or for a period of one year after the termination of employment with ABBOTT, in each country in which ABBOTT conducts business, engage, directly or indirectly, for the benefit of EMPLOYEE or others, in any activity or employment in the performance of which any Confidential Information obtained, provided or otherwise acquired, directly or indirectly, during the term of employment with ABBOTT is likely to be used or disclosed, notwithstanding EMPLOYEE's undertaking to the contrary. This paragraph shall apply only to the extent permitted by the laws of the state in which EMPLOYEE works on behalf of ABBOTT or worked immediately prior to the termination of employment with ABBOTT, and shall not be construed to limit in any way EMPLOYEE's obligation not to use or disclose Confidential Information as set forth in Paragraph 8 above.

11.     EMPLOYEE shall not, directly or indirectly, during the term of employment with ABBOTT or for a period of one year after termination of employment with ABBOTT, promote or market any Competing Products to any Abbott Customer, or solicit any Abbott Customers for purposes of selling any Competing Products.

12.     EMPLOYEE shall not, during the term of employment with ABBOTT or for a period of two years after termination of employment with ABBOTT, directly or indirectly, for the benefit of EMPLOYEE or others, solicit or assist in soliciting to work as an employee, independent contractor, partner, or otherwise, any employee of ABBOTT about whom EMPLOYEE acquired knowledge through EMPLOYEE's employment with ABBOTT.

13.     This Agreement shall not be construed to limit in any way any "shop right," "fiduciary duty" or other common law or statutory or contractual rights of ABBOTT, in or to any Intellectual Property or Confidential Information, including without limitation any trade secrets, which ABBOTT has or may have by virtue of EMPLOYEE's employment.

14.     EMPLOYEE is employed at will, meaning either ABBOTT or EMPLOYEE may terminate the employment relationship at any time, with or without notice, and for any reason or no reason at all.

15.     For a period of two years after termination of employment with ABBOTT, EMPLOYEE shall communicate EMPLOYEE's obligations under this Agreement to each subsequent employer(s), including providing to each subsequent employer(s) a copy of this Agreement, and shall advise ABBOTT of the name and address of EMPLOYEE's intended future employer. ABBOTT shall have the right to advise any subsequent employer of EMPLOYEE's obligations hereunder.

16.     If any provision or provisions (or portions thereof) of this Agreement are held to be unenforceable by any court, such provision or provisions (or portions thereof) will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and be enforceable.  This Agreement shall inure to the benefit of, be binding upon and be enforceable by ABBOTT, and its successors and assigns and EMPLOYEE and EMPLOYEE's heirs, executors, and administrators.

17.     This Agreement shall be construed, and its enforceability and the relationship of the parties shall be determined, in all respects under the laws of Illinois, without giving effect to conflict of laws.

18.     EMPLOYEE acknowledges receipt of and agrees to comply with the ABBOTT Code of Business Conduct.

19.     The failure or refusal by ABBOTT either to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a custom or practice contrary to such provision or right of this Agreement.

20.     This Agreement is the sole, entire, and complete agreement of the parties relating to the subject matter hereof, replaces and supersedes all prior versions and representations, and shall apply, notwithstanding that such employment may include significant changes in responsibilities, location, and other terms and conditions, including nature or scope of Confidential Information to which EMPLOYEE has access.  The obligations under this Agreement shall survive termination of employment.

21.     No statements, promises, or representations have been made by any party to the other, or relied upon, other than as expressly provided in this Agreement with respect to the subject matter of the Agreement.  This Agreement (and any provision thereof) may not be modified, changed, clarified or interpreted by the parties, except in a writing specifying the modification, change, clarification or interpretation, and signed by an ABBOTT Corporate Officer and EMPLOYEE.

Mark Stenhouse
EMPLOYEE Printed Name

EMPLOYEE Signature & DATE          8/6/2012

1192 Oak Knoll Drive
Lake Forest IL 60045
EMPLOYEE Address

EMPLOYEE SOCIAL SECURITY # or UPI

City, State, Zip

ABBOTT LABORATORIES *(For CHR Use Only)*

By _____

Dated _____ 8/10 _____ , 20 1 2

ABBOTT WITNESS Signature & DATE          8/6/12

3

# EXHIBIT B

# EMPLOYEE AGREEMENT

AGREEMENT made between ABBOTT LABORATORIES, an Illinois corporation, on behalf of itself and its Subsidiaries (as hereinafter defined) (collectively, "ABBOTT"), and the undersigned employee ("EMPLOYEE"), WITNESS the following:

EMPLOYEE is engaged by ABBOTT in a position of trust and confidence in which EMPLOYEE may use, observe, or obtain Confidential Information (as hereinafter defined).

EMPLOYEE, by reason of the nature of EMPLOYEE's duties, will be provided with information and/or facilities and equipment which may enable EMPLOYEE to make discoveries, inventions, improvements, or innovations useful to ABBOTT.

It is to the mutual benefit of ABBOTT and EMPLOYEE that ABBOTT protect its rights in Confidential Information and obtain the benefit of discoveries, inventions, improvements, and innovations developed by its employees.

In consideration of the execution of this Agreement by other key employees of ABBOTT, the mutual agreements contained herein and the present and future employment of EMPLOYEE by ABBOTT, it is agreed:

1.  The following terms shall have the following meanings for all purposes of this Agreement:

    (a)    "Confidential Information" shall mean methods, processes, techniques, shop practices, formulae, compounds, compositions, organisms, computer software, equipment, research data, clinical and pharmacological data, marketing and sales information, personnel data, customer lists, financial data, plans and all other know-how and trade secrets which are in the possession of ABBOTT and which have not been published or disclosed to the general public.

    (b)    "Subsidiary" shall mean a company, corporation, partnership, joint venture, business trust or other entity having a distinct legal identity, and any branch or office of any of the foregoing, thirty percent (30%) or more of the assets or voting securities of which is owned, directly or indirectly, by ABBOTT.

2.  All memoranda, notes, records, reports, photographs, drawings, plans, papers, computer software, compounds and other documents, products and materials made or compiled by or made available to EMPLOYEE during the course of employment with ABBOTT, and any copies, summaries or abstracts thereof, whether or not they contain Confidential Information, are and shall be the property of ABBOTT and shall be delivered to ABBOTT by EMPLOYEE prior to termination of employment with ABBOTT.

3.  All discoveries, inventions, improvements, software and innovations, whether patentable, copyrightable or not (including all data and records pertaining thereto) which EMPLOYEE may invent, discover, originate, or conceive during the term of employment with ABBOTT, and which in any way relate to or are or may be useful in connection with the business of ABBOTT, shall be the sole and exclusive property of ABBOTT. EMPLOYEE shall promptly and fully disclose each and all such discoveries, inventions, improvements, software or innovations to ABBOTT.

4.  EMPLOYEE shall assign to ABBOTT EMPLOYEE's entire right, title, and interest to any of the discoveries, inventions, improvements, software and innovations described in Paragraph 3 of this Agreement and any related U.S. or foreign patents, patent applications and copyrights; shall execute any instruments considered necessary by ABBOTT to convey or perfect ABBOTT's ownership thereof; and shall assist ABBOTT in obtaining, defending and enforcing its rights therein. ABBOTT shall bear all expenses it authorizes be incurred in connection with such activity and shall pay to EMPLOYEE reasonable compensation for any time spent by EMPLOYEE performing such duties at the request of ABBOTT after termination of employment.

5.  EMPLOYEE shall not, without the written consent of ABBOTT, during the term of employment with ABBOTT, or thereafter, use for the benefit of EMPLOYEE or others, or disclose to others, any Confidential Information obtained during the course of employment with ABBOTT.

6.    EMPLOYEE shall not, during the term of employment with ABBOTT, or, without ABBOTT's written consent, for a period of one year after the termination of employment with ABBOTT engage, directly or indirectly, for the benefit of EMPLOYEE or others, in any activity or employment in the performance of which any Confidential Information obtained during the course of employment with ABBOTT would reasonably be considered to be useful. These convenants shall not be construed to limit in any way EMPLOYEE's obligation not to use or disclose Confidential Information as set forth in Paragraph 5 above.

7.    EMPLOYEE recognizes that ABBOTT has a substantial investment in its employees and therefore agrees that EMPLOYEE shall not, during the term of employment with ABBOTT, or, without the written consent of ABBOTT, for a period of two years after termination of employment with ABBOTT directly or indirectly, for the benefit of Employee or others, employ, attempt to employ, solicit for employment, or in any other way, assist in employing, as an employee, consultant, partner, shareholder, or otherwise, any employee of ABBOTT about whom EMPLOYEE acquired knowledge through EMPLOYEE's ABBOTT employment.

8.    This Agreement shall not be construed to limit in any way any "shop rights" or other common law or contractual rights of ABBOTT, in or to any discoveries, inventions, improvements, and innovations, and in or to any Confidential Information which ABBOTT, has or may have by virtue of EMPLOYEE's employment.

9.    It is understood that either ABBOTT or EMPLOYEE may terminate the employment relationship at any time. Upon such termination EMPLOYEE shall advise ABBOTT of the name and address of EMPLOYEE's intended future employer. The parties' obligations under this Agreement shall survive such termination of employment.

10.    If any provision or provisions of this Agreement shall be held to be unenforceable by any court, the remaining provisions shall be unaffected and shall continue in full force and effect. This Agreement shall inure to the benefit of, be binding upon and be enforceable by ABBOTT, and its successors and assigns and EMPLOYEE and EMPLOYEE's heirs, executors, and administrators.

11.    This Agreement, and its enforceability, shall be governed in all respects by the laws of Illinois.

12.    I acknowledge receipt of and agree to comply with the ABBOTT Code of Business Conduct.


_____
Witness

_____
EMPLOYEE

2123 Crescent Ave., Charlotte NC 28207
Address

_____
Employee Social Security Number

ABBOTT LABORATORIES

Dated _____ JAN 1 8 1991 _____ 19 ___ By _O. Ralph Edwards_

10504B-R1

# EXHIBIT C

Case: 1:18-cv-07223 Document #: 1-2 Filed: 10/30/18 Page 39 of 76 PageID #:64

# MARK STENHOUSE

Management Team | Board of Directors | Company History | Contact Us



*download original image*

## PRESIDENT, COLOGUARD

**Joined Exact Sciences:** 2018

**Key Responsibility:** Lead the Cologuard commercial functions, including sales, marketing, market access, commercial operations and medical affairs.

**Previous Employment:** At Abbott Laboratories/AbbVie, Stenhouse led the sales and marketing teams for one of the most successful pharmaceutical products. During nearly 30 years at the company, his roles included Vice President, US Immunology, AbbVie, Vice President Gastroenterology, AbbVie, Sr. Director, Immunology, Abbott Laboratories, Marketing Director, Immunology, Abbott Laboratories, and Nationals Sales Director, Immunology, Abbott Laboratories.

**Education:** BS, Business College of Charleston

There's nothing more important to me than leading a team of smart people who engage collaboratively and lean in to their mission. Exact Sciences truly captures it all – the highest quality science, committed people, and the value its products offer.

About Exact Sciences · Contact Us · Terms of Use · Patents & Trademarks · Purchasing Terms & Conditions · Privacy Policy

© Exact Sciences Corporation – 441 Charmany Drive – Madison, WI 53719

# MARK STENHOUSE TO JOIN EXACT SCIENCES AS PRESIDENT, COLOGUARD

By Exact Sciences / March 20, 2018

03/20/2018

MADISON, Wis., March 20, 2018 /PRNewswire/ — Exact Sciences Corp. (Nasdaq: EXAS), the company that developed and commercialized Cologuard®, the only FDA-approved, noninvasive stool DNA-based test for early detection of colorectal cancer, today announced that Mark Stenhouse has been appointed to the new role of president, Cologuard. Stenhouse, vice president, U.S. Immunology at AbbVie, will assume this new position on April 2, 2018.



"More than 85 million people are eligible to be screened with Cologuard, and Mark brings the experience and passion to help us reach further into this enormous population," said Kevin Conroy, chairman and CEO of Exact Sciences. "Mark's track record launching and guiding a product to blockbuster status, and his experience within the field of gastrointestinal diseases, makes him the ideal leader to amplify our early success after launching Cologuard."

At Abbott Laboratories/AbbVie, Stenhouse leads the sales and marketing teams for one of the most successful pharmaceutical products, the anti-inflammatory drug HUMIRA®. The top-selling drug in the United States for the fifth straight year, it generated $18.4 billion in worldwide net revenue and accounted for 65 percent of AbbVie's total net revenue in 2017.

"The story of Exact Sciences and the science powering Cologuard are incredibly compelling, which is why I'm enthusiastic about accepting this opportunity," Stenhouse said. "There's nothing more important to me than leading a team of smart people who engage collaboratively and lean in to their mission. I view this as an opportunity to take a highly innovative screening test that fills an unmet healthcare need, and which has already undergone the most successful launch of any diagnostic product in history, to the next level. Exact Sciences truly captures it all – the highest quality science, committed people, and the value its products offer."

Stenhouse spent nearly 30 years at Abbott Laboratories/AbbVie, where he was first hired for a field sales position. He steadily worked his way through product management and sales management to become national sales director in the U.S. Immunology-Gastroenterology franchise. From there, he rose to marketing director,

followed by senior director of commercial initiatives. In 2010, Stenhouse was appointed a general manager within the company before being promoted to vice president. He earned a Bachelor of Science in business administration from College of Charleston.

## About Cologuard

Cologuard was approved by the FDA in August 2014 and results from Exact Sciences' prospective 90-site, point-in-time, 10,000-patient pivotal trial were published in the New England Journal of Medicine in March 2014. Cologuard is included in the American Cancer Society's (2014) colorectal cancer screening guidelines and the recommendations of the U.S. Preventive Services Task Force (2016) and National Comprehensive Cancer Network (2016). Cologuard is indicated to screen adults of either sex, 50 years or older, who are at average risk for colorectal cancer. Cologuard is not for everyone and is not a replacement for diagnostic colonoscopy or surveillance colonoscopy in high-risk individuals. False positives and false negatives do occur. Any positive test result should be followed by a diagnostic colonoscopy. Following a negative result, patients should continue participating in a screening program at an interval and with a method appropriate for the individual patient. Cologuard performance when used for repeat testing has not been evaluated or established. For more information about Cologuard, visit www.cologuardtest.com. Rx Only.

## About Exact Sciences Corp.

Exact Sciences Corp. is a molecular diagnostics company focused on the early detection and prevention of the deadliest forms of cancer. The company has exclusive intellectual property protecting its non-invasive, molecular screening technology for the detection of colorectal cancer. For more information, please visit the company's website at www.exactsciences.com, follow Exact Sciences on Twitter @ExactSciences or find Exact Sciences on Facebook.

## Safe Harbor Statement

This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, that are intended to be covered by the "safe harbor" created by those sections. Forward-looking statements, which are based on certain assumptions and describe our future plans, strategies and expectations, can generally be identified by the use of forward-looking terms such as "believe," "expect," "may," "will," "should," "would," "could," "seek," "intend," "plan," "goal," "project," "estimate," "anticipate" or other comparable terms. All statements other than statements of historical facts included in this news release regarding our strategies, prospects, financial condition, operations, costs, plans and objectives are forward-looking statements. Examples of forward-looking statements include, among others, statements we make regarding expected future operating results, anticipated results of our sales and marketing efforts, expectations concerning payer reimbursement and the anticipated results of our product development efforts. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on our current beliefs, expectations and assumptions regarding the future of our business, future plans and strategies, projections, anticipated events and trends, the economy and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of our control. Our actual results and financial condition may differ materially from those indicated in the forward-looking statements. Therefore, you should not rely on any of these forward-looking statements. Important factors that could cause our actual results and financial condition to differ materially from those indicated in the forward-looking statements include, among others, the following: our

ability to successfully and profitably market our products and services; the acceptance of our products and services by patients and healthcare providers; our ability to meet demand for our products and services; the willingness of health insurance companies and other payers to cover Cologuard and adequately reimburse us for our performance of the Cologuard test; the amount and nature of competition from other cancer screening and diagnostic products and services; the effects of the adoption, modification or repeal of any healthcare reform law, rule, order, interpretation or policy; the effects of changes in pricing, coverage and reimbursement for our products and services, including without limitation as a result of the Protecting Access to Medicare Act of 2014; recommendations, guidelines and quality metrics issued by various organizations such as the U.S. Preventive Services Task Force, the American Cancer Society, and the National Committee for Quality Assurance regarding cancer screening or our products and services; our ability to successfully develop new products and services; our success establishing and maintaining collaborative, licensing and supplier arrangements; our ability to maintain regulatory approvals and comply with applicable regulations; and the other risks and uncertainties described in the Risk Factors and in Management's Discussion and Analysis of Financial Condition and Results of Operations sections of our most recently filed Annual Report on Form 10-K and our subsequently filed Quarterly Reports on Form 10-Q. We undertake no obligation to publicly update any forward-looking statement, whether written or oral, that may be made from time to time, whether as a result of new information, future developments or otherwise.

Exact Sciences Corp
Contact: J.P. Fielder
+1 608-210-5220
jpfielder@exactsciences.com

Tweet    Share    Like 0    Share    G+

## SUBSCRIBE TO THE BLOG

Email*

Notification Frequency*
- Instant
- Weekly
- Monthly

**Subscribe**

10/23/2018

## TOPICS

**Exact Sciences News (77)**

**Investor Relations (24)**

**Colon Cancer News and Information (18)**

**Company (16)**

**Healthy Living (13)**

**Press Releases (13)**

**Hero of the Month (10)**

**Partnerships (7)**

**Colon Cancer Awareness (3)**

**Community (2)**

see all

About Exact Sciences - Contact Us - Terms of Use - Patents & Trademarks - Purchasing Terms & Conditions - Privacy Policy

© Exact Sciences Corporation – 441 Charmany Drive – Madison, WI 53719

# EXHIBIT D

Case: 1:18-cv-07223 Document #: 1-2 Filed: 10/29/18 Page 45 of 76 PageID #:70

 

# EXACT SCIENCES AND PFIZER ENTER INTO U.S. PROMOTION AGREEMENT FOR COLOGUARD®

By Exact Sciences / August 22, 2018

Collaboration is expected to drive Cologuard adoption through expanded sales and marketing efforts

MADISON, Wis. and NEW YORK, Aug. 22, 2018 /PRNewswire/ — Exact Sciences Corp. (Nasdaq: EXAS) and Pfizer Inc. (NYSE: PFE) today announced an agreement through 2021 to co-promote Cologuard, the first and only FDA-approved non-invasive stool DNA screening test for colorectal cancer. Pfizer will join Exact Sciences' sales representatives in reaching both physicians and health systems and will also actively participate in extending and deepening the Cologuard marketing campaign.

  

Colorectal cancer is recognized as the most preventable yet least prevented form of cancer and remains the second leading cause of cancer death in the U.S., with more than 50,000 deaths each year. Nine out of 10 people survive more than five years when colorectal cancer is diagnosed in Stages I or II, but only one out of 10 people survive more than five years when the disease is diagnosed in Stage IV. While patient outcomes can be improved through early detection, fewer than two-thirds of people are up-to-date with recommended colorectal cancer screening guidelines.

"This partnership marks a turning point in the fight to end colorectal cancer," said Kevin Conroy, chairman and CEO of Exact Sciences. "Pfizer is joining Exact Sciences' mission of eradicating colorectal cancer by helping detect the disease at its earliest, most treatable stages. Together we can help reduce the prevalence of colorectal cancer by combining the power of Cologuard and the talented Exact Sciences team with Pfizer's experience, relationships and resources."

Exact Sciences and Pfizer seek to increase colorectal cancer screening rates by accelerating adoption of Cologuard, an accurate, easy-to-use test that's fully covered by Medicare and most major health insurance plans. Exact Sciences brings a sales force with expertise in colorectal cancer, the innovative science of Cologuard and a recognizable direct-to-consumer marketing campaign. Pfizer brings a large and experienced sales force and relationships integrating with the leading health systems, two areas where Cologuard is most often prescribed, along with deep marketing expertise.

"There is a significant patient need to increase colorectal cancer screening, and our field force has long established relationships with providers who prescribe first-line preventative treatments to patients," said Nick Lagunowich, regional president, North America, Pfizer Internal Medicine. "By joining forces with Exact Sciences to bring this non-invasive colorectal cancer screening option to more providers and their patients, we hope to substantially increase the early detection of colorectal cancer."

Under the terms of the agreement, Pfizer will co-promote Cologuard with Exact Sciences beginning in the fourth quarter of 2018. Exact Sciences will maintain responsibility for all aspects of manufacturing and laboratory operations of Cologuard. Pfizer will share gross profits and marketing expenses equally above an agreed upon baseline.

More information about the agreement is available here, in a form 8-K that Exact Sciences will file in compliance with Securities and Exchange Commission rules.

**Exact Sciences Conference Call & Webcast**
Exact Sciences will host a conference call and webcast on Wednesday, Aug. 22, 2018, at 8:00 a.m. ET to discuss the agreement. The webcast will be available at www.exactsciences.com. Domestic callers should dial (877) 201-0168 and international callers should dial +1 (647) 788-4901.

An archive of the webcast will be available at www.exactsciences.com. A replay of the conference call will be available by calling 800-585-8367 domestically or 416-621-4642 internationally. The access code for the replay of the call is 5278277. The webcast, conference call and replay are open to all interested parties.

**About Cologuard**
Cologuard was approved by the FDA in August 2014 and results from Exact Sciences' prospective 90-site, point-in-time, 10,000-patient pivotal trial were published in the New England Journal of Medicine in April 2014. Cologuard is included in the American Cancer Society's (2018) colorectal cancer screening guidelines and the recommendations of the U.S. Preventive Services Task Force (2016) and National Comprehensive Cancer Network (2016). Cologuard is indicated to screen adults of either sex, 50 years or older, who are at typical average-risk for CRC. Cologuard is not for everyone; not for high risk individuals, including those with

## SUBSCRIBE TO THE BLOG

Email*

Notification Frequency*
- Instant
- Weekly
- Monthly

[Subscribe]

## TOPICS

Exact Sciences News (77)
Investor Relations (24)
Colon Cancer News and Information (18)
Company (16)
Healthy Living (13)
Press Releases (13)
Hero of the Month (10)
Partnerships (7)
Colon Cancer Awareness (3)
Community (2)
see all

Case: 1:18-cv-07223 Document #: 1-2 Filed: 10/29/18 Page 46 of 76 PageID #:71

a family history of colorectal cancer, a personal history of cancer or advanced adenoma, IBD, and certain hereditary syndromes. Positive Cologuard results should be referred to diagnostic colonoscopy. A negative Cologuard test result does not guarantee absence of cancer or advanced adenoma. Following a negative result, patients should continue participating in a

screening program at an interval and with a method appropriate for the individual patient. Cologuard performance when used for repeat testing has not been evaluated or established. Medicare and most major insurers cover Cologuard. For more information about Cologuard, visit www.cologuardtest.com. Rx only.

**About Exact Sciences Corp.**

Exact Sciences Corp. is a molecular diagnostics company focused on the early detection and prevention of the deadliest forms of cancer. The company has exclusive intellectual property protecting its non-invasive, molecular screening technology for the detection of colorectal cancer. For more information, please visit the company's website at www.exactsciences.com, follow Exact Sciences on Twitter @ExactSciences or find Exact Sciences on Facebook.

**About Pfizer Inc., Working together for a healthier world®**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of health care products. Our global portfolio includes medicines and vaccines as well as many of the world's best-known consumer health care products. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 150 years, we have worked to make a difference for all who rely on us. We routinely post information that may be important to investors on our website at www.pfizer.com. In addition, to learn more, please visit us on www.pfizer.com and follow us on Twitter at @Pfizer and @Pfizer_News, LinkedIn, YouTube and like us on Facebook at Facebook.com/Pfizer.

**Exact Sciences Safe Harbor Statement**

This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, that are intended to be covered by the "safe harbor" created by those sections. Forward-looking statements, which are based on certain assumptions and describe our future plans, strategies and expectations, can generally be identified by the use of forward-looking terms such as "believe," "expect," "may," "will," "should," "would," "could," "seek," "intend," "plan," "goal," "project," "estimate," "anticipate" or other comparable terms. All statements other than statements of historical facts included in this news release regarding our strategies, prospects, financial condition, operations, costs, plans and objectives are forward-looking statements. Examples of forward-looking statements include, among others, statements we make regarding expected future operating results, anticipated results of our sales and marketing efforts, expectations concerning payer reimbursement and the anticipated results of our product development efforts. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on our current beliefs, expectations and assumptions regarding the future of our business, future plans and strategies, projections, anticipated events and trends, the economy and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of our control. Our actual results and financial condition may differ materially from those indicated in the forward-looking statements. Therefore, you should not rely on any of these forward-looking statements. Important factors that could cause our actual results and financial condition to differ materially from those indicated in the forward-looking statements include, among others, the following: our ability to successfully and profitably market our products and services; the acceptance of our products and services by patients and healthcare providers; our ability to meet demand for our products and services; the willingness of health insurance companies and other payers to cover Cologuard and adequately reimburse us for our performance of the Cologuard test; the amount and nature of competition from other cancer screening and diagnostic products and services; the effects of the adoption, modification or repeal of any healthcare reform law, rule, order, interpretation or policy; the effects of changes in pricing, coverage and reimbursement for our products and services, including without limitation as a result of the Protecting Access to Medicare Act of 2014; recommendations, guidelines and quality metrics issued by various organizations such as the U.S. Preventive Services Task Force, the American Cancer Society, and the National Committee for Quality Assurance regarding cancer screening or our products and services; our ability to successfully develop new products and services; our success establishing and maintaining collaborative, licensing and supplier arrangements; our ability to maintain regulatory approvals and comply with applicable regulations; and the other risks and uncertainties described in the Risk Factors and in Management's Discussion and Analysis of Financial Condition and Results of Operations sections of our most recently filed Annual Report on Form 10-K and our subsequently filed Quarterly Reports on Form 10-Q. We undertake no obligation to publicly update any forward-looking statement, whether written or oral, that may be made from time to time, whether as a result of new information, future developments or otherwise.

**Pfizer Disclosure Notice**

The information contained in this release is as of August 22, 2018. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about a U.S. co-promote agreement between Pfizer and Exact Sciences Corp. to co-promote Cologuard that involves substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, uncertainties regarding the commercial success of Cologuard; the willingness of health insurance companies and other payers to cover Cologuard and adequately reimburse us for performance of the Cologuard test; the amount and nature of competition from other cancer screening and diagnostic products and services; decisions by regulatory authorities regarding labeling and other matters that could affect the availability or commercial potential of Cologuard; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and

"Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the U.S. Securities and Exchange Commission and available at www.sec.gov and www.pfizer.com.

**Exact Sciences contact:**
J.P. Fielder – jpfielder@exactsciences.com
+1 608 210 5220

**Pfizer contact:**
Neha Wadhwa – neha.wadhwa@pfizer.com
+1 212 733 2835

View original content with multimedia: http://www.prnewswire.com/news-releases/exact-sciences-and-pfizer-enter-into-us-promotion-agreement-for-cologuard-300700625.html

SOURCE EXACT SCIENCES CORP

Topics: Press Releases

   

## RECOMMENDED CONTENT



PRESS RELEASES   August 15, 2018

**University Research Park Breaks Ground on Corporate Headquarters Building for Exact Sciences**



PRESS RELEASES   June 26, 2018

**Nurse Practitioners are Critical Source of Colorectal Cancer Screening Information for Patients, Survey Shows**



PRESS RELEASES   May 30, 2018

**Exact Sciences Applauds American Cancer Society's Updated Colorectal Cancer Screening Guidelines to Include People Age 45-49**

About Exact Sciences - Contact Us - Terms of Use - Patents & Trademarks - Purchasing Terms & Conditions - Privacy Policy



© Exact Sciences Corporation – 441 Charmany Drive – Madison, WI 53719

# EXHIBIT E

Discover Thomson Reuters

Directory of sites    Login    Contact    Support

REUTERS    World    Business    Markets    Politics    TV

🔍 Search...

Imprisoned In Myanmar     Energy & Environment     Brexit     North Korea     Charged: The Future of Autos     Future of Money     Breakingviews

HEALTH NEWS    AUGUST 22, 2018 / 5:05 AM / 2 MONTHS AGO

# Exact Sciences surges after marketing deal with Pfizer for cancer test

Tamara Mathias, Saumya Joseph                                                    3 MIN READ

(Reuters) - Exact Sciences Corp's shares shot up as much as 26 percent on Wednesday after the company said Pfizer Inc would share marketing expenses and co-promote the company's stool screening test for colorectal cancer.

The companies will invest a combined $48 million, shared equally, next year to market the non-invasive DNA screening test Cologuard, Exact Sciences Chief Executive Officer Kevin Conroy told Reuters in an interview.

"The marketing effort will begin in the fourth quarter (and) we expect the impact (of it) to occur next year," Conroy said, adding that the company is currently investing about $80 million in advertising and promoting Cologuard.

Approved in the United States in 2014 to screen adults aged 50 or older at average risk for colorectal cancer, sales of the diagnostic test jumped 78 percent to nearly $103 million in the latest reported quarter.

The company reiterated its revenue forecast for 2018 and said it expects about $700 million in 2019. Analysts on average have forecast 2019 revenue of $611 million, according to Thomson Reuters I/B/E/S.

The diagnostics firm will continue to manufacture the test, with Pfizer chipping in with its sales force to boost marketing to primary care clinics and large hospitals.

"This story has always been about driving uptake more so than profitability over the next few years, and this should accomplish this nicely," William Blair analyst Brian Weinstein said.

Pfizer will receive 50 percent of gross profit above an agreed-upon baseline, Conroy said.

Colorectal cancer is the third-leading cause of cancer-related deaths in men and women in the United States and is expected to cause about 50,630 deaths in 2018.

Earlier this year, the American Cancer Society recommended people at risk of the disease start regular screening at 45 rather than 50, as studies increasingly show a rise in cases among younger individuals.

Exact Sciences shares were up 23 percent at $61.57 in early trading on Wednesday.

Reporting by Tamara Mathias and Saumya Sibi Joseph in Bengaluru; Editing by Sriraj Kalluvila

*Our Standards:* <u>*The Thomson Reuters Trust Principles.*</u>

---

Apps    Newsletters    Advertise with Us    Advertising Guidelines    Cookies    Terms of Use    Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2018 Reuters. All Rights Reserved.

https://www.reuters.com/article/us-exact-sci-pfizer/exact-sciences-surges-after-marketing-deal-with-pfizer-for-cancer-test-idUSKCN1L70YQ    2/2

# EXHIBIT F

██████████████

**From:** Hardin, Melanie P
**Sent:** Monday, April 16, 2018 7:28 AM
**To:** melaniehardin87@gmail.com
**Subject:** Spiritual Journey

████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████

**Tuesday - 11/28/17:**
███████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████

██████████████████████████████████████ █ ███████████████████████

████████████
███ ████ █████████████████████████ █ ██████████████████████

████████████████████████████████████████████



Wednesday, 02/28/18

Stenhouse just told me he may be leaving AbbVie and wants to take me with him (he had the same conversation with ███ ), ██

████████████████████████████

**Friday, 03/09/18**
███████████  ████████████████████

████████████████████████████████████████████████████████████
████████████████████████████

██████████████████████████████████████████████████ Mark reached out about dinner next week with 'a select group' of people and I can only surmise he's made the decision to leave. I have complete peace about doing the same - especially if they buy out my pension. ██████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████

████████████████████████████████████████████████████████████
████

████████████████████████████████████████████████████████████
████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

██████████████  ████████████████
██████████
█████████████████████████
███████████████████████
██████████████████
█████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████



**Saturday, 03/17/18**

The job has tons of appeal, working with Mark, being given authority and being unleashed - all of those things I know would happen.



**Thursday, 03/22/18**

I had dinner with Mark tonight and it was very revealing. You saw that he wants me to come with him to his new company - personally. But he is measured with making no promises (which he shouldn't) and the necessity for me to vet what is 'worth it' for me to leave AbbVie. I was very assertive in that I didn't want to be another clog in the wheel. I could have a high profile job and excel - especially if we were building something special. He concurred I would not be a cog in the wheel.

**Wednesday, 04/04/18**



I've already been anxious today about 2 things. Mark reached out to me about an Exact Science job – it wasn't my area of expertise and not reporting to him. I told him I can't come in as a middle manager again and expect to be able to negotiate with what I'll be walking away from at AbbVie. He also said AbbVie would come after me when I go - but his lawyers don't think they'll have standing.



Sunday, 04/08/18

Kaye called me as Mark is starting to freak out about the prospect of getting sued and us all trying to come to Exact. I'm continuing down the road of vetting the company and any opportunities that might be out there, but I have the peace that surpasses all understanding about it.

Melanie Hardin
Senior Marketing Manager
Strategic Marketing
Immunology - Dermatology
Cell (352) 262-8144

# EXHIBIT G



Search

Are You an Attorney? - We need more attorneys in your area. Apply now for membership. Ad ...



PREMIUM

**Mark Stenhouse**
President, Cologuard at Exact Sciences

+ Follow

View full profile

**Mark Stenhouse** · 3rd
President, Cologuard at Exact Sciences
7mo

•••

**Exact Sciences**
13,274 followers
7mo

+ Follow

We're hiring! Keep an eye out for our billboards across Madison, including this one on the eastbound Beltline. Learn more about careers at Exact Sciences at **https://lnkd.in/e934fJQ**.



37 Likes · 1 Comment

👍 Like    💬 Comment    ↗ Share          Top Comments ▾

**Likes**

+29

Add a comment...

**Andrew Leopold** · 3rd                                    7mo  •••
Michigan Medical Sales Rep. 616-323-5551
Please consider me for positions in Michigan and Indiana. I have oncology and GI experience.
Like   Reply







# EXHIBIT H

| | |
|---|---|
| **From:** | Cesnovar, Karin L <karin.cesnovar@abbvie.com> |
| **Sent:** | Wednesday, September 12, 2018 3:50 PM |
| **To:** | Cook, Amy B |
| **Cc:** | Patel, Mamta N; Burbrink, Brian D |
| **Subject:** | FW: Strategic Sr. Director of Customer Experience Possibility  - Let's set up time to connect! |

FYI
Here is an example of the email the employees received regarding the opening at Exact.

---

**KARIN CESNOVAR**
Director, Business Human Resources
U.S. Commercial Immunology & Oncology

abbvie

4 SE 30408
26525 N. Riverwoods Blvd.
Mettawa, Illinois 60045
**OFFICE**   +1 847-937-2918
**EMAIL**   karin.cesnovar@abbvie.com

**abbvie.com**

This communication may contain information that is proprietary, confidential, or exempt from disclosure. If you are not the intended recipient, please note that any other dissemination, distribution, use or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

**From:** Barry, Laura J
**Sent:** Wednesday, September 12, 2018 3:47 PM
**To:** Cesnovar, Karin L
**Subject:** Re: Strategic Sr. Director of Customer Experience Possibility - Let's set up time to connect!

It's an email blast.  To the best of my knowledge they are keying in on CE, directors.  Cathy Mecker, Sage, Jen Feeley, Chris McClurg, myself...  not sure of others.

Pretty common form, she doesn't look like a retained recruiter.

Laura

Sent from my iPhone

On Sep 11, 2018, at 12:40 PM, Sarah Cueto <inmail-hit-reply@linkedin.com> wrote:

> Hi Laura,
>
> I wanted to follow up with you about a newly retained search we are conducting for Exact Sciences Corp. (NASDAQ: EXAS) to fill their new Sr. Director, Customer Experience position based in

Madison, WI. This is a very rare opportunity with a company that has grown quickly though only penetrated 2% of the marketplace. Exact Sciences' flagship product, Cologuard, was approved by the FDA in August 2014, is the first noninvasive screening test for colorectal cancer that analyzes both sample DNA and blood biomarkers, and has been proven to find 92 percent of cancers and 69 percent of the most advanced precancerous polyps in average risk patients.

Check them out at www.exactsciences.com

I would be happy to schedule a convenient time to speak further about this role and if you're not personally interested, feel free to make a referral or two for anyone who may have interest or may be good networking contacts. I would appreciate it very much!

All the best,
Sarah

Sarah Cueto
Executive Search Consultant at Toft Group Executive Search

  

View Sarah's LinkedIn profile

 You can respond to Sarah by replying to this email

You are receiving InMail notification emails. Unsubscribe
This email was intended for Laura Barry (Senior Director, Customer Insights, Analytics, and Experiences at AbbVie). Learn why we included this.

If you need assistance or have questions, please contact LinkedIn Customer Service.

© 2018, LinkedIn Corporation. 1000 West Maude Avenue, Sunnyvale, CA 94085, USA



| | |
|---|---|
| **From:** | Cesnovar, Karin L <karin.cesnovar@abbvie.com> |
| **Sent:** | Wednesday, September 19, 2018 10:57 AM |
| **To:** | Cook, Amy B; Patel, Mamta N |
| **Subject:** | FW: [EXTERNAL] Fwd: Networking re VP HR position - Flourishing   Oncology Diagnostics Company |

**Details of the Linked In email I received**

**Networking re VP HR position - Flourishing Oncology Diagnostics Company**

Hi Karin, I came across your impressive background and am reaching out to you regarding a newly created position for a Vice President of Human Resources. The search is on behalf of Exact Sciences (NASDAQ: EXAS), a molecular diagnostics company focused on early detection and prevention of cancer. They have a tremendous success story - - they've experienced the most successful diagnostic product launch in history with Cologuard, the 1st noninvasive, molecular screening test for colorectal cancer. Mark Stenhouse, formerly with Abbvie, just joined the company as President. The company is growing by leaps and bounds from a financial and operational perspective and is making significant investments into its future, especially for its talent. It's important to the company to ensure that high-performing and motivated teams are in place as it scales up. This role will take ownership of all talent acquisition, talent management, and HR processes and how they impact and support the overall corporate strategy. I'd love to network with you on this role. Are you available for an introductory call? Best regards, Tyeara Tyeara Shelly Director, Executive Search Toft Group **tshelly@thetoftgroup.com** 1-858-926-2710

**KARIN CESNOVAR**
Director, Business Human Resources
U.S. Commercial Immunology & Oncology



4 SE 30408
26525 N. Riverwoods Blvd.
Mettawa, Illinois 60045
**OFFICE**   +1 847-937-2918
**EMAIL**  karin.cesnovar@abbvie.com

**abbvie.com**

This communication may contain information that is proprietary, confidential, or exempt from disclosure. If you are not the intended recipient, please note that any other dissemination, distribution, use or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

**From:** Karin Cesnovar [mailto:karin.cesnovar@gmail.com]
**Sent:** Wednesday, September 19, 2018 10:53 AM
**To:** Cesnovar, Karin L
**Subject:** [EXTERNAL] Fwd: Networking re VP HR position - Flourishing Oncology Diagnostics Company

On Sunday, June 10, 2018, Tyeara via LinkedIn <inmail-hit-reply@linkedin.com> wrote:

Karin Cesnovar

Karin, your InMail from Tyeara is awaiting response

**Tyeara Shelly**
Executive Director at Toft Group Executive Search

Hi Karin,

I came across your impressive background and am reaching out to you regarding a newly created position for a Vice President of Human Resources.

The search is on behalf of Exact Sciences (NASDAQ: EXAS), a molecular diagnostics company focused on early detection and prevention of cancer. They have a tremendous success story - - they've experienced the most successful diagnostic...

see more

Interested

Maybe later

No thanks

Unsubscribe | Help

You are receiving InMail reminder emails.

This email was intended for Karin Cesnovar (Director, Business Human Resources at AbbVie).
Learn why we included this.

© 2018 LinkedIn Corporation, 1000 West Maude Avenue, Sunnyvale, CA 94085. LinkedIn and the LinkedIn logo are registered trademarks of LinkedIn.

| | |
|---|---|
| **From:** | Cook, Amy L <Amy.Cook@abbvie.com> |
| **Sent:** | Tuesday, September 18, 2018 12:21 PM |
| **To:** | Cook, Amy B |
| **Subject:** | FW: [EXTERNAL] Fwd: Networking re VP HR position - Flourishing Oncology Diagnostics Company |

Is this for you?

**From:** Malathy Dwaraknath [mailto:malathy.dwaraknath@gmail.com]
**Sent:** Tuesday, September 18, 2018 12:56 PM
**To:** Cook, Amy L
**Subject:** [EXTERNAL] Fwd: Networking re VP HR position - Flourishing Oncology Diagnostics Company


---------- Forwarded message ---------
From: **Tyeara Shelly** <inmail-hit-reply@linkedin.com>
Date: Thu, Jun 7, 2018 at 2:18 PM
Subject: Networking re VP HR position - Flourishing Oncology Diagnostics Company
To: Malathy Dwaraknath <malathy.dwaraknath@gmail.com>


Hi Malathy,

I came across your impressive background and am reaching out to you regarding a newly created position for a Vice President of Human Resources.

The search is on behalf of Exact Sciences (NASDAQ: EXAS), a molecular diagnostics company focused on early detection and prevention of cancer. They have a tremendous success story - - they've experienced the most successful diagnostic product launch in history with Cologuard, the 1st noninvasive, molecular screening test for colorectal cancer. Mark Stenhouse, formerly with Abbvie, recently joined the company as President.

The company is growing by leaps and bounds from a financial and operational perspective and is making significant investments into its future, especially for its talent. It's important to the company to ensure that high-performing and motivated teams are in place as it scales up. This role will take ownership of all talent acquisition, talent management, and HR processes and how they impact and support the overall corporate strategy.

I'd love to network with you on this role. Are you available for an introductory call?

Best regards,
Tyeara


Tyeara Shelly
Director, Executive Search
Toft Group

tshelly@thetoftgroup.com
1-858-926-2710



View Tyeara's LinkedIn profile

TIP   You can respond to Tyeara by replying to this email

You are receiving InMail notification emails. Unsubscribe
This email was intended for Malathy Dwarakanath (Human Resources Business Leader at AbbVie). Learn why we included this.

If you need assistance or have questions, please contact LinkedIn Customer Service.

© 2018, LinkedIn Corporation. 1000 West Maude Avenue, Sunnyvale, CA 94085, USA



--
Sent from Gmail Mobile

| | |
|---|---|
| **From:** | Gascoigne, Doreen <doreen.gascoigne@abbvie.com> |
| **Sent:** | Wednesday, September 19, 2018 11:44 AM |
| **To:** | Cook, Amy B |
| **Cc:** | Patel, Mamta N |
| **Subject:** | Opportunity notice |

Amy – fyi - I received this inquiry through my LinkedIn profile.

Best regards,

---

**DOREEN GASCOIGNE, PHR**
Associate Director, Business Human Resources
U.S. Commercial



#changemakers

abbvie

Dept. PPLI-0583/ABV1 5 NW 30306
26525 N. Riverwoods Blvd.
Mettawa, Illinois 60045
**OFFICE**  +1 847-938-6544
**CELL**  +1 224-399-5291
**EMAIL**  doreen.gascoigne@abbvie.com

**abbvie.com**

This communication may contain information that is proprietary, confidential, or exempt from disclosure. If you are not the intended recipient, please note that any other dissemination, distribution, use or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

---

- Networking re VP HR position - Flourishing Oncology Diagnostics Company

Hi Doreen, I came across your impressive background and am reaching out to you regarding a newly created position for a Vice President of Human Resources. The search is on behalf of Exact Sciences (NASDAQ: EXAS), a molecular diagnostics company focused on early detection and prevention of cancer. They have a tremendous success story - - they've experienced the most successful diagnostic product launch in history with Cologuard, the 1st noninvasive, molecular screening test for colorectal cancer. Mark Stenhouse, formerly with Abbvie, recently joined the company as President. The company is growing by leaps and bounds from a financial and operational perspective and is making significant investments into its future, especially for its talent. It's important to the company to ensure that high-performing and motivated teams are in place as it scales up. This role will take ownership of all talent acquisition, talent management, and HR processes and how they impact and support the overall corporate strategy. I'd love to network with you on this role. Are you available for an introductory call? Best regards, Tyeara Tyeara Shelly Director, Executive Search Toft Group **tshelly@thetoftgroup.com** 1-858-926-2710

Best regards,

**DOREEN GASCOIGNE, PHR**
Business Human Resources
U.S. Commercial



#changemakers

abbvie

Dept. PPLI-0583/ABV1 5 NW 30306
26525 N. Riverwoods Blvd.
Mettawa, Illinois 60045
**OFFICE**  +1 847-938-6544
**CELL**  +1 224-399-5291
**EMAIL**  doreen.gascoigne@abbvie.com

**abbvie.com**

This communication may contain information that is proprietary, confidential, or exempt from disclosure. If you are not the intended recipient, please note that any other dissemination, distribution, use or copying of this communication is strictly prohibited. Anyone who receives

this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ABBVIE INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No.:  18CH00001213 |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MARK STENHOUSE, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## (PROPOSED) TEMPORARY RESTRAINING ORDER

The Court, having considered the submissions and arguments of Plaintiff's counsel in support of Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction, including the Verified Complaint, its incorporated exhibits, and affidavits submitted in this matter, finds that Plaintiff AbbVie Inc. has demonstrated a need for emergency injunctive relief in this case.

Accordingly, it is **ORDERED** that, pending a hearing on preliminary injunction, Defendant Mark Stenhouse is enjoined from further violating Paragraph 12 of his Employment Agreement by directly or indirectly soliciting or assisting in soliciting any employee of AbbVie about whom he acquired knowledge during his employment at AbbVie to work at Exact Sciences as an employee, independent contractor, partner, or otherwise.

This Temporary Restraining Order shall remain in effect until the hearing for preliminary injunction, scheduled for _____.

Dated: October __, 2018

_____

Hon. _____

Prepared by:
Shayna S. Cook
ARDC No. 6285959
Alan E. Littmann
ARDC No. 6283389
Michael Casner
ARDC No. 6316585
Goldman Ismail Tomaselli
Brennan & Baum LLP
564 West Randolph Street, Suite 400
Chicago, IL 60661
(312) 681-6000
(312) 881-5191
scook@goldmanismail.com
alittmann@goldmanismail.com
mcasner@goldmanismail.com

*Attorneys for Plaintiff AbbVie Inc.*
_____